656 F.2d 1115
 AMERICAN TRUCKING ASSOCIATIONS, INC. and Saia Motor Freight
Lines, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS, et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 81-4046, 81-4080.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 Sept. 21, 1981.
 Kenneth E. Siegel, Washington, D.C., for petitioners.
 Craig M. Keats, Atty., ICC, Kenneth P. Kolson, John J. Powers, III, Dept. of Justice, Washington, D.C., Wiley G. Lastrapes, Jr., New Orleans, La., John Guandolo, Washington, D.C., for respondents.
 
 
 1
 Cyrus C. Guidry, Port Counsel, New Orleans, La., for Bd. of Comm. Port of New Orleans.
 
 
 2
 Stanley B. Hebert, Oakland, Cal., B. Carlton Bailey, Jr., Sea-Land Ind. Inc., Edison, N. J., for Port of Oakland.
 
 
 3
 R. Frederic Fisher, San Francisco, Cal., for Pacific Westbound Conference.
 
 
 4
 Raymond J. Salassi, Jr., New Orleans, La., Albert B. Russ, Jr., Jacksonville, Fla., for Seaboard Coast Line R.R., et al.
 
 
 5
 Wiley Lastrapes, New Orleans, La., John Guandolo, John D. Quinn, John T. Downing, Washington, D.C., for Sea-Land Service, Inc., et al.
 
 
 6
 K. Edward Wolcott, Atlanta, Ga., for Watkins Motor Lines, Inc.
 
 
 7
 Raymond J. Salassi, Jr., New Orleans, La., Louis P. Warchot, II, San Francisco, Cal., for Southern Pacific Transportation Co.
 
 
 8
 Robert A. Peavy, Howard T. Weir, Washington, D.C., for U. S. Flag Far East Discussion Agreement.
 
 
 9
 Neal M. Mayer, Washington, D.C., for Seapack Container Service, S. A.
 
 
 10
 Raymond J. Salassi, Jr., New Orleans, La., Frederick G. Pfrommer, San Francisco, Cal., Louis P. Warchot, II, San Francisco, Cal., Albert B. Russ, Jr., Jacksonville, Fla., for The Atchison, Topeka and Santa Fe Railway Co., et al.
 
 
 11
 John A. Daily, Philadelphia, Pa., for Consolidated Rail Corp.
 
 
 12
 Alan P. Sherbrooke, Thomas M. Kilbane, Jr., Seattle, Wash., Brockman Adams, Washington, D.C., for Totem Ocean Trailer Express, Inc.
 
 
 13
 Stanley O. Sher, Anthony J. Ciccone, Jr., John Attanasio, Washington, D.C., for Australia-Eastern U.A.A. Shipping Conference, et al.
 
 
 14
 Petitions for Review of an Order of the Interstate Commerce Commission.
 
 
 15
 Before MARKEY*, Chief Judge, and GEE and POLITZ, Circuit Judges.
 
 GEE, Circuit Judge:
 
 16
 Before us today are challenges to a decision of the Interstate Commerce Commission ("ICC" or "Commission") exempting from regulation rail and truck transportation provided by rail carriers in connection with trailer-on-flatcar (TOFC) and container-on-flatcar (COFC) service. 46 Fed.Reg. 14,348 (1981). TOFC and COFC services involve intermodal operations in which the various goods shipped are not handled individually. Rather, they are loaded into a trailer or container that then can be expeditiously transferred from one mode of transportation to another. The exemption applies to (1) domestic rail TOFC/COFC transportation; (2) domestic TOFC/COFC transportation provided by trucks owned and operated by railroads; and (3) domestic TOFC/COFC rail or rail-owned truck transportation involving goods with a prior or subsequent movement by ocean carrier (ex-water traffic). While petitioners[1] seek review of the exemption as it applies to all three kinds of services, the more serious challenges are made to the latter two. We deny the petitions for review except as to the exemption's application to the government-owned and subsidized Alaska Railroad.
 
 The Commission's Statutory Authority
 Background
 
 17
 In 1976, Congress passed the Railroad Revitalization and Regulatory Reform Act, Pub. L. No. 94-210, 90 Stat. 31 ("4-R Act"), in response to poor financial and competitive conditions of the rail industry[2] and its recognition that regulation was a cause of the rail industry's difficulties.[3] Included in the 4-R Act was a provision, section 207, which gave the ICC authority to exempt rail services from regulation when, in the Commission's judgment, certain conditions were met.[4] This authority was exercised, apparently satisfactorily, to exempt rail transportation of fresh fruits and vegetables. Rail General Exemption Authority Fresh Fruit and Vegetables, 361 I.C.C. 374 (1979).
 
 
 18
 Again, in 1980, Congress addressed the economic and competitive condition of the rail industry when it enacted the Staggers Rail Act of 1980, 94 Stat. 1895 (codified in scattered sections of 49 U.S.C.) ("Staggers Act"). In section 2 of that Act, Congress set forth explicit findings as to the need to revamp the regulatory scheme governing the rail industry.[5] The Staggers Act also contained a provision, section 101(a), now codified at 49 U.S.C. § 10101a, that explicitly stated the nation's rail transportation policy. The first two subsections of section 10101a read as follows:
 
 
 19
 In regulating the railroad industry, it is the policy of the United States Government
 
 
 20
 (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
 
 
 21
 (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required....
 
 
 22
 The exemption authority the Commission had been granted in the 4-R Act was altered by section 213 of the Staggers Act; under new section 10505 the Commission is directed to grant an exemption when it finds that, with respect to a person, class of persons, or a transaction or service regulation
 
 
 23
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 
 
 24
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.[6]
 
 
 25
 The ICC's authority to revoke an exemption should it find that regulation is necessary was retained. 49 U.S.C. § 10505(d). The legislative history of section 10505 reveals that it was considered an "important cornerstone" of the Staggers Act and that, under it, "the Commission is charged with the responsibility of actively pursuing exemptions for transportation and service that comply with the section's standards." H.R.Rep.No. 96-1035, 96th Cong., 2d Sess. 60 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4005. Further, as to the Commission's exercise of its exemption authority, the Conference Report states that "the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power." H.R.Rep.No. 96-1430, 96th Cong., 2d Sess. 105 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4137.
 
 Domestic Rail TOFC/COFC Transportation
 
 26
 The challenged exemption was granted pursuant to the Commission's authority under section 10505.[7] Some of the petitioners and intervenors argue that the Commission exceeded its statutory authority under section 10505 by granting the exemption. That argument clearly is without merit insofar as the "core" of the exemption applying to domestic rail TOFC/COFC transportation is concerned: after giving the Commission authority to grant exemptions when certain conditions are met in subsection (a) of section 10505, Congress, in subsection (f), singled out "transportation that is provided by a rail carrier as a part of a continuous intermodal movement"[8] as appropriate for deregulation.
 
 Rail-owned Motor Carrier TOFC/COFC Service
 
 27
 The more difficult statutory authority issue is the applicability of the exemption to TOFC/COFC transportation provided by trucks owned by railroads. The parties have, as they must, made arguments relating to the literal language of the statute, the structure and scheme of the Interstate Commerce Act ("the Act") and the legislative history of that Act in an attempt to demonstrate the intent of Congress with respect to whether rail-owned motor carrier TOFC/COFC service was an appropriate subject for an exemption under section 10505. Our review of the competing contentions leaves us with some doubt as to whether Congress had any intent whatsoever on that issue. Because we find rail-owned truck transportation of TOFC/COFC traffic within the scope of the literal language of section 10505, and because we find no clear indication in the remainder of the Act or its legislative history that such service was not a proper subject for an exemption, we reject petitioners' argument that the Commission exceeded its statutory authority in granting the exemption.
 
 
 28
 Petitioners first argue that the Commission's section 10505(f) authority "to exempt transportation that is provided by a rail carrier" extends only to rail transportation. We disagree rail-owned truck TOFC/COFC service is "transportation that is provided by a rail carrier." Had Congress intended to limit the Commission's exemption authority to rail transportation, it could easily have done so by using that language. Instead, it chose the broad "transportation-that-is-provided-by-a-rail-carrier" language and presumably did so with knowledge that it previously had defined "transportation" to include the movement of passengers or property by motor vehicle. 49 U.S.C. § 10102(24).[9]
 
 
 29
 More important, the source of the Commission's authority to grant exemptions is found in section 10505(a) and not in section 10505(f), which simply singles out continuous intermodal movement as an appropriate candidate for the exercise of the Commission's section 10505(a) exemption authority. Section 10505(a) authorizes the Commission to grant an exemption "(i)n a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter" when certain findings are made. Again we note that Congress has chosen not to define narrowly the Commission's exemption authority but instead has extended that authority to "matter(s) related to a rail carrier providing transportation...." We find that transportation of TOFC/COFC traffic by rail-owned trucks is a "matter related to a rail carrier providing transportation" within the meaning of section 10505(a). We base this finding on the literal language of sections 10505(a) and (f), on the fact that the transportation of TOFC/COFC traffic in trucks owned and operated by railroads is closely related to railroads providing rail transportation and on the failure of petitioners to demonstrate what other, more narrowly circumscribed matters Congress could have had in mind when it enacted section 10505(a).[10]
 
 
 30
 Petitioners' legislative history argument is grounded primarily on the fact that when Congress enacted the Motor Carrier Act of 1980, 94 Stat. 793 (codified in scattered sections of 49 U.S.C.), it specifically rejected a proposed amendment that would have exempted truck service incidental to rail TOFC/COFC service from ICC regulation; instead it enacted section 10322(b)(2), which requires that applications for authority to provide such motor carrier service be handled expeditiously.[11] Further, Congress addressed two other aspects of intermodal rail-motor vehicle traffic in other sections of the Motor Carrier Act and the Staggers Act. In the former, Congress specified the circumstances under which motor common and contract carriers are allowed to deliver to or receive from a rail carrier a trailer moving in TOFC service. 49 U.S.C. §§ 10922(j) and 10923(e).[12] In the Staggers Act, Congress created a means by which rail carriers and rail-affiliated motor carriers could provide "motor transportation prior or subsequent to rail transportation to serve inadequately served shippers located on a railroad other than the applicant carrier." 49 U.S.C. § 11344(e).[13]
 
 
 31
 Petitioners argue that these actions of Congress all taken in the same year (1980) in which section 10505 was enacted demonstrate that Congress did not intend to give the Commission authority to exempt rail-owned truck TOFC/COFC service because such an exemption effectively nullifies the comprehensive program Congress enacted to promote and facilitate intermodal service. While the argument is not without force, we do not find it dispositive. Sections 10322(b)(2), 10922(j) and 10923(e), which apply to all motor carrier TOFC/COFC service, will not be nullified by the exemption because it applies only to TOFC/COFC service provided by trucks owned and operated by railroads. Similarly, the exemption does not embrace rail-affiliated motor carriers so that it also will not nullify section 11344(e). In our view, the fact that the exemption has a limiting effect on the scope of these other provisions of the Interstate Commerce Act does not demonstrate that Congress did not mean what it said in sections 10505(a) and (f).
 
 
 32
 Petitioners also argue that exempting rail-owned motor carrier TOFC/COFC service is beyond the Commission's statutory authority because subchapter II requires, with limited and specified exceptions not applicable here, that all motor carriers be licensed. See n.9, supra. This argument essentially is that all motor carrier service, regardless of who provides it, is subject to ICC regulation unless an exemption in subchapter II applies. We find no indication that the modes of transportation are so completely separated as to warrant such a conclusion. To the contrary, in section 10523 of subchapter II the Act specifically provides that motor vehicle transportation provided by a rail carrier in a terminal area is subject to ICC jurisdiction under subchapter I and not under subchapter II. An argument could be made that because section 10523 limits rail-owned truck service that is subject to ICC jurisdiction under subchapter I to such service provided in a terminal area, all other rail-owned truck service is regulated exclusively under subchapter II and thus is not a proper subject for the exercise of an arguably ambiguous grant of exemption authority found in subchapter I; while that argument has some merit, we do not find it sufficient to overcome the broad, plain language used in sections 10505(a) and 10505(f).
 
 
 33
 We conclude that the Commission had the authority under section 10505(a) to exempt motor carrier TOFC/COFC service provided by rail carriers.
 
 Ex-water TOFC/COFC Service
 
 34
 A number of the petitioners argue that in section 10505 Congress did not intend to authorize the Commission to exempt movements involving ocean carriage. In light of the fact that the exemption deregulates only the rail portion of rail-ocean carrier intermodal movements, the argument that granting the exemption was beyond the ICC's statutory authority is unpersuasive. The exemption will affect "joint-through-rated" movements in which a single tariff is published covering both the rail and ocean carrier portions of the transportation because the rail carrier's portion of such joint rates need no longer be published. That effect, however, is not so substantial as to demonstrate that Congress did not intend to allow the Commission to exempt ex-water traffic. First, much of the ex-water continuous intermodal movements involve separate rail and ocean carrier tariffs. Second, the Federal Maritime Commission ("FMC") has so acted as no longer to require that the rail-ocean carrier division of the joint-through rate be published. Accordingly, the ocean carriers are still able to use and to publish the joint-through rates; those rates will now be negotiated with the individual railroad involved.
 
 
 35
 Inconsistencies with Other Statutory Provisions
 
 
 36
 Petitioners also argue that Congress did not intend the Commission's exemption authority to extend to ex-water traffic because such an exemption interferes and is inconsistent with various other provisions of the Act and with other statutes administered by the FMC. For instance, under 46 U.S.C. § 884, railroads are prohibited from preferring foreign flag carriers by charging them a lower rate than is extended to American flag carriers. Because railroads need no longer publish their rates, petitioners contend that the FMC will be unable to enforce this statute and that therefore Congress cannot have intended to allow the Commission to exempt ex-water traffic. We disagree; the issue is simply one of obtaining information as to such illegal discrimination. We note that the antitrust laws are enforced without benefit of published prices. Further, under section 10505 the Commission is authorized to revoke previously granted exemptions; the railroads will therefore have a strong incentive not to engage in such abuses of their market power.
 
 
 37
 Section 707 of the Staggers Act provides that:
 
 
 38
 With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful (1) any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition and that was unlawful on the effective date of this Act, or (2) any other competitive practice that is unfair, destructive, predatory, or otherwise undermines competition.
 
 
 39
 Petitioners argue that the exemption's applicability to ex-water traffic is invalid because, under the exemption, this provision of the Staggers Act is emasculated. According to petitioners, the exemption permits rail carriers to engage in unfair, destructive, or predatory practices that were unlawful prior to passage of the Staggers Act. This argument, which essentially is that the exemption will allow railroads to abuse their market power, must also fail. Under section 10505(a), an exemption cannot be granted absent a finding that regulation "is not necessary to carry out the transportation policy of section 10101a of this title." Section 10101a provides, among other things, that "it is the policy of the United States Government ... to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes." 49 U.S.C. § 10101a(5). See also 49 U.S.C. § 10101a(13). Furthermore, under section 10505(d), the Commission is authorized to revoke an exemption when it finds that regulation is necessary to carry out the transportation policy of section 10101a. Accordingly, in our view the exemption does not make lawful any "competitive practice that is unfair, destructive, predatory, or otherwise undermines competition." Rather, with respect to TOFC/COFC service, it simply exempts the railroads from regulation, thus allowing them to compete. Should the railroads develop sufficient market power to engage in the kinds of destructively competitive practices referred to in section 707 of the Staggers Act and engage in such practices, the exemption will be revoked and regulation restored.[14]
 
 
 40
 An argument similar to that based on section 707 is made with respect to section 212 of the Staggers Act, 49 U.S.C. § 10741(b), which prohibits unreasonable discrimination by railroads.[15] As did the section 707 argument, this contention must fail on the ground that should the railroads develop and abuse market power by engaging in unreasonably discriminatory conduct, the exemption will be revoked.[16]
 
 
 41
 Several petitioners argue that the exemption, which broadly exempted rail and truck service provided by rail carriers from Title 49, subchapter IV of the United States Code, violates section 10505(e). Under that section, Congress has provided that "(n)o exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title." This concern has been addressed by the Commission in a "Clarification of Notice of Final Rule (Exemption)" dated June 10, 1981, that essentially provides that the exemption does not and could not relieve rail carriers from the provisions of 49 U.S.C. § 11707. 46 Fed.Reg. 32257 (1981).
 
 
 42
 A major contention of a number of petitioners is that the exemption is invalid because of the Commission's failure to obtain the approval of the Federal Maritime Commission pursuant to section 19(2) of the Merchant Marine Act of 1920, 46 U.S.C. § 876(2). That section provides in relevant part that "(n)o rule or regulation shall be established by any department, board, bureau, or agency of the Government which affects shipping in the foreign trade ... until such rule or regulation has been submitted to the Federal Maritime Commission for its approval and final action has been taken thereon by the Commission or the President." Claiming that the exemption is not "the sort of rule or regulation affecting shipping in the foreign trade contemplated by section 19," the ICC did not formally submit the exemption to the FMC for its approval. In response, the FMC has filed an amicus curiae memorandum in which it contends that the exemption does fall within section 19 but concludes that it "has not withheld approval of the ICC's rules." Petitioners argue that the exemption is subject to section 19 and that substantial compliance with section 19 is not adequate to satisfy the statutory command that the FMC affirmatively approve actions of other agencies affecting shipping in the foreign trade and take final action thereon. Since we find that the FMC has approved the exemption within the meaning of section 19, we need not resolve the dispute between the agencies about whether section 19 was implicated by the ICC's action in exempting ex-water TOFC/COFC service.
 
 
 43
 The FMC filed comments to the ICC's proposed exemption in which it stated that it did "not oppose the proposed exemption in principle." Rather, its primary concern was with the timing of the exemption's effective date. Prior to the new exemption, the FMC and ICC both required that the rail-ocean carrier division of a joint-through rate be published. Under the new exemption, however, railroads are no longer required to publish rates applicable to TOFC/COFC service at all. The FMC was thus concerned with the effect of the exemption on its rules requiring that the rail-ocean carrier division of joint-through rates be published and requested additional time to modify its tariff-filing requirements and to allow ocean carriers to amend their FMC tariffs. While the ICC did not postpone the effective date of the exemption for so long as was requested by the FMC, it did delay the effective date some 40 days. Two days following the exemption's new effective date, the FMC published interim rules under which ocean carriers were required to publish only the joint-through rate and not the rail-ocean carrier rate division.
 
 
 44
 As we have noted, the FMC has also filed an amicus curiae memorandum with our court in this proceeding. That memorandum concludes that, as "the FMC's review of (the new exemption) indicates that problems which may be created by the ICC's rules may properly be addressed and treated by the rules which the FMC can and will issue with respect to joint and through intermodal rates in foreign commerce, the FMC has not withheld approval of the ICC's rules." Thus, the FMC has reviewed the exemption, has commented on it, has requested and received additional time to respond to it, and has concluded that it had no objection to the exemption. We conclude that any possible conflict between the ICC's exemption and the FMC's duties relating to the regulation of ocean carrier traffic have been resolved and that the requirements of section 19 have been satisfied.
 
 
 45
 Was the ICC Arbitrary and Capricious?
 
 
 46
 As stated, the challenged exemption was granted pursuant to 49 U.S.C. § 10505(a), which directs the Commission to grant exemptions when it "finds that the application of a provision of this subtitle
 
 
 47
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 
 
 48
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 
 
 49
 Petitioners and intervenors argue that the exemption was invalidly granted because the findings required by section 10505(a) and made by the Commission[17] were not adequately supported.
 
 
 50
 In American Trucking Association, Inc. v. United States, 642 F.2d 916 (5th Cir. 1981), we reiterated the standard by which we review such agency rulemaking as that challenged in this case:
 
 
 51
 Because we lack the knowledge and experience needed to evaluate the transportation requirements of the nation, we accord the Commission a great deal of discretion and appropriately defer to its expertise. We are to review this informal rule-making conducted under § 553 of the Administrative Procedure Act (APA) only to determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review is narrow. We neither weigh the evidence before the Commission nor assess the wisdom of the rule promulgated, and we inquire into the soundness of the Commission's reasoning only to determine that its conclusions are rationally supported. United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972). Our task is to ensure that the agency considered all relevant factors and avoided clear errors in judgment. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The agency must articulate a rational connection between the facts as it finds them and the conclusions it premises on those facts. Id. We cannot supply a reasoned basis for agency action that the agency itself has not given, but "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Id. at 285-86; 95 S.Ct. at 442.
 
 
 52
 Id. at 920.
 
 
 53
 The finding that regulation was not necessary to protect shippers from abuses of market power by railroads was based primarily on subsidiary findings that rail and rail-owned truck TOFC/COFC service is competitive with motor carrier service and on findings that intramodal competition within the rail industry was active.[18] In addition, the Commission abolished railroad antitrust immunity for exempt TOFC and COFC service and relied on the existence of potential antitrust liability in finding that regulation was not necessary to prevent abuses of market power by railroads.
 
 
 54
 The motor carriers contend that the exemption will give railroads virtual monopoly power over TOFC/COFC service. This argument is most difficult to make in light of the fact that in section 10505(f) Congress specifically authorized the Commission to exempt TOFC/COFC rail service. While section 10505(f) does not absolve the Commission from the need to make the section 10505(a) findings, it does indicate plainly that Congress felt that TOFC/COFC service was an appropriate subject for the exercise of the Commission's section 10505(a) exemption authority. In this regard, we note that, by enacting the Staggers Act, of which what is now section 10505 was a part, Congress explicitly found that "today, most transportation within the United States is competitive (and that) nearly two-thirds of the Nation's intercity freight is transported by modes of transportation other than railroads." Pub.L. No. 96-448, §§ 2(3) and 2(5), 94 Stat. 1895. Furthermore, several parties who commented on the proposed exemption indicated that substantial competition exists between rail and motor carriers for TOFC/COFC service. Finally, because antitrust immunity for railroads will not be continued as to TOFC/COFC traffic, we note that motor carriers will be competing with individual rail carriers and not with a rail industry collectively acting to monopolize TOFC/COFC services. We conclude that the Commission was not arbitrary and capricious in finding and relying upon intermodal competition as a basis for its finding that regulation of TOFC/COFC service was not required to prevent abuses of market power by railroads.
 
 
 55
 A number of petitioners and intervenors argue that, notwithstanding the existence of intermodal competition for domestic TOFC/COFC service, railroads have monopoly power with respect to ex-water intermodal traffic. The Commission responded to this concern by noting the existence of both intermodal and intramodal competition for this traffic. The finding of intramodal competition was based on a study[19] of five North Atlantic port ranges and the individual ports within those ranges. The port ranges were found to be in competition with each other, and competition among rail carriers within two of the ports was found to be vigorous. The Commission's decision concludes its discussion of intramodal competition with the statement that: "The competitive relationships we have described for the North Atlantic port range exist in the other port ranges as well and, in the absence of collective rate making, are sufficient to prevent abuse and unlawful discrimination, and to permit competition and the demand for services to establish reasonable rates for transportation by rail."
 
 
 56
 Petitioners correctly point out that the ICC erroneously stated that each of the five ports involved in the North Atlantic study are served by more than one rail carrier. In fact, New York is served solely by Conrail. Further, the State of Alaska is served only by one railroad, the Alaska Railroad. In our view, the fact that a small minority of ports are served by only one railroad is not sufficient to make the Commission's exemption decision an arbitrary or capricious one. As noted, the Commission relied on competition between ports as well as competition within individual ports. Further, based on a different study that questioned the existence of any significant line haul economies of scale between single car and multiple car movements, the Commission noted that rail-motor carrier competition may well exist for ex-water shipments.
 
 
 57
 Petitioners and intervenors dispute the Commission's conclusion as to intermodal competition for ex-water traffic primarily on the basis of evidence submitted by one ocean carrier that 95 percent of its 1980 shipments in excess of 400 miles went by rail because motor carrier service was not competitive. As to this evidence, it is significant to note that less than 25 percent of this ocean carrier's 1980 container movements traveled in excess of 400 miles; presumably the bulk of this short-haul traffic was shipped by motor carrier.
 
 
 58
 In conclusion, we note again that our task in reviewing this exemption decision by the ICC is not to weigh the evidence, or even to ascertain whether substantial evidence supports the agency action. Rather, we review the decision to make certain that all relevant factors were considered and that the Commission has articulated a rational connection between the facts as it finds them and the conclusion it premises on those facts. A decision to deregulate by exemption some portion of railroad transportation necessarily cannot be made on the basis of data from past experience no such data exists. As discussed, section 10505(a) confers broad discretionary power on the Commission; the legislative history of the Staggers Act makes clear that Congress intended that the Commission exercise its exemption authority until the only regulation remaining is that "necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose." H.R.Rep. No. 96-1430, 96th Cong., 2d Sess. 105, reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4137. That Congress recognized that the effects of a particular exemption decision could not be predicted with certainty and thus that the Commission would be exercising its exemption authority in the face of uncertainty as to the effect of an exemption is apparent from both the controlling statute and its legislative history. Section 10505(d) provides the Commission with the authority to "revoke an exemption, to the extent it specifies" when it finds that regulation is necessary, and the conference report states the expectation of the conferees that "the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power." Id. Except as to the Alaska Railroad, which we discuss below, we conclude that the action of the ICC in granting the challenged exemption was not arbitrary or capricious.
 
 
 59
 With respect to the Alaska Railroad, one of the intervenors argues that the Commission acted in an arbitrary and capricious manner in exempting any of its operations because it is government owned and subsidized, the only railroad operating in Alaska. Thus, even if deregulated, the Alaska Railroad's rates will not be controlled by competitive market forces. Further, because of sovereign immunity, the Alaska Railroad is immune from the antitrust laws notwithstanding the fact that the exemption generally abolished antitrust immunity for railroads engaging in exempt TOFC/COFC transportation. Finally, the argument is made that Congress did not intend that the Alaska Railroad be deregulated because in the Staggers Act Congress directed the Commission to investigate the Alaska Railroad's rates in response to allegations that it had been engaged in predatory pricing to the injury of its privately owned competitors. We find these arguments persuasive and conclude that the exemption of the Alaska Railroad cannot stand.
 
 
 60
 The Commission supports its decision to include Alaska within the exemption by pointing to evidence that competition between rail and motor carriers for TOFC/COFC service exists in Alaska. Further, the exemption decision contains an acknowledgment by the ICC that the problem posed by including the Alaska Railroad in the exemption is "the type of situation which may require some attention in the future" and states that the Commission will monitor the situation and correct any abuses of market power. We do not find these factors sufficient to support the inclusion of the Alaska Railroad within the exemption. An exemption cannot be granted under section 10505(a) unless the Commission finds that regulation is not necessary to further the transportation policy of section 10101a. Section 10101a(5) provides that "it is the policy of the United States Government to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes." See also 49 U.S.C. § 10101a(13), set forth in n.16. In our view, the Commission acted in an arbitrary and capricious manner when it included the Alaska Railroad the rates of which are not determined by competitive market forces and which is not subject to the antitrust laws, Sea-Land Service, Inc. v. Alaska Railroad, 659 F.2d 243 (D.C.Cir.1981) within the scope of the exemption in the face of a congressional directive that the Alaska Railroad's rates be investigated to determine whether it is engaging in predatory pricing to the injury of its privately owned competitors. See Staggers Rail Act, Pub.L.No.96-448, § 709, 94 Stat. 1895.[20]
 
 Scope of the Exemption
 
 61
 A number of the petitioners and intervenors challenge the validity of the exemption on the ground that it is not limited either to transportation provided by a rail carrier or to TOFC/COFC service. As to the former, the exemption decision, 46 Fed.Reg. 14348 (1981), amended 49 C.F.R. 1039.11 to read, in relevant part: "All railroad tariffs pertaining to the transportation of intermodal freight will no longer apply ...." The argument is that some intermodal freight that had been subject to railroad tariffs was not provided by rail carriers. For example, tariffs filed by the Alaska Railroad covered transportation provided by Alaska Hydro-Train, a water carrier, from the contiguous 48 states to Alaska, as well as transportation within Alaska on the railroad itself. Thus, petitioners contend that the literal language of the exemption, as published in the Code of Federal Regulations, operates to exempt transportation that is not provided by a rail carrier and therefore violates section 10505(f), which authorizes exemptions only with respect to "transportation that is provided by a rail carrier." The Commission responds that it has made clear throughout the proceedings that the exemption applies only to rail and rail-owned motor carrier TOFC/COFC service and that it does not operate to exempt any service provided by Alaska Hydro-Train or any other water carrier.[21]
 
 
 62
 Petitioners' second contention as to the scope of the exemption is that it applies to non-TOFC/COFC service even though throughout the course of the proceedings relating to the exemption the ICC indicated an intent to exempt only TOFC/COFC service. The basis for the argument is that the exemption decision, 46 Fed.Reg. 14348 (1981), amended 49 C.F.R. 1039.11 so that the exemption applies to "intermodal" service rather than to TOFC/COFC service. The distinction is significant because intermodal service is broader than TOFC/COFC service; for instance, intermodal boxcar traffic comes within the broad "intermodal" service language but is not an example of TOFC/COFC service. The Commission responds that it intended to exempt only TOFC/COFC service, that it made that intention clear throughout the course of the administrative proceedings, and that a formal amendment to the exemption provision in 49 C.F.R. § 1039.11 is not needed.
 
 
 63
 Thus, the parties are in agreement that the exemption was intended to apply only to TOFC/COFC service provided by a rail carrier. The dispute concerns the effect of the failure of the exemption, as it appears in the Code of Federal Regulations, so to limit its scope. Agency regulations should, of course, be clearly drafted to provide concerned parties with notice of the effect of the regulations on them. While we strongly suggest that the regulation be amended to state precisely the scope of the exemption, we do not find its failure to be drafted as precisely as it should have been fatal. As to whether the exemption extends to transportation other than that provided by a rail carrier, the first sentence of 49 C.F.R. § 1039.11 has been amended to read: "Railroad and truck transportation provided by a rail carrier as part of a continuous intermodal movement is exempt ...." While the latter statement in the regulation that "(a)ll railroad tariffs pertaining to the transportation of intermodal freight will no longer apply" arguably creates an ambiguity, the Commission's decision providing notice of the exemption published at 46 Fed.Reg. 14348 (1981) makes it clear that the exemption applies only to transportation provided by a rail carrier.
 
 
 64
 With respect to TOFC/COFC traffic, there is nothing in the Code of Federal Regulations that suggests that the exemption is limited to TOFC/COFC traffic. However, the Advance Notice of Proposed Rule (Exemption), 44 Fed.Reg. 49279 (1979), the Notice of Proposed Rule (Exemption), 45 Fed.Reg. 79123 (1980), and the Notice of Final Rule (Exemption), 46 Fed.Reg. 14348 (1981), all explicitly state that the exemption applies only to TOFC/COFC service. The Commission did not consider exempting non-TOFC/COFC service, and the public was not given an opportunity to comment upon an exemption of non-TOFC/COFC service. Accordingly, a contention by the Commission that the exemption applied to non-TOFC/COFC service certainly would fail. As stated, however, no such contention has been made. In fact, in a decision served on March 20, 1981, the Commission reiterated its position as to the scope of the exemption: "Throughout this proceeding, we have made clear that the proposed exemption will apply only to TOFC/COFC service." Ex Parte No. 230 (Sub-No. 5) Improvement of TOFC/COFC Regulation (not printed, served March 20, 1981).
 
 
 65
 The petitions for review are DENIED except as to the exemption's application to the Alaska Railroad.
 
 
 
 *
 Of the United States Court of Claims and Patent Appeals, sitting by designation
 
 
 [1]
 This litigation involves two consolidated petitions for review of the ICC exemption decision. The petitioners are: the Board of Commissioners of the Port of New Orleans; Delta Steamship Lines, Inc.; the Port of Houston Authority; Houston Port Bureau, Inc.; the Port of Long Beach; the Port of Los Angeles; the Port of Oakland; the Port of San Francisco; Sea-Land Service, Inc.; United States Lines, Inc.; American Trucking Associations, Inc.; and Saia Motor Freight Line, Inc. A number of parties, including ocean carrier conferences, railroads, a water carrier, and a motor carrier, have been allowed to intervene
 
 
 [2]
 E. g., H.R. Rep. No. 94-725, 94th Cong., 1st Sess. 80 (1975)
 
 
 [3]
 S.Rep. No. 94-499, 94th Cong., 2d Sess. 2 (1976), U.S. Code Cong. & Admin. News 1976, 14
 
 
 [4]
 Section 207 provided:
 Whenever the Commission determines, upon petition by the Secretary or an interested party or upon its own initiative, in matters relating to a common carrier by railroad subject to this chapter, after notice and reasonable opportunity for a hearing, that the application of the provisions of this chapter (i) to any person or class of persons, or (ii) to any services or transactions by reason of the limited scope of such services or transactions, is not necessary to effectuate the national transportation policy declared in this Act, would be an undue burden on such person or class of persons or on interstate and foreign commerce, and would serve little or no useful public purpose, it shall, by order, exempt such persons, class of persons, services, or transactions from such provisions to the extent and for such period of time as may be specified in such order. The Commission may, by order, revoke any such exemption whenever it finds, after notice and reasonable opportunity for a hearing, that the application of the provisions of this chapter to the exempted person, class of persons, services, or transactions, to the extent specified in such order, is necessary to effectuate the national transportation policy declared in this Act and to achieve effective regulation by the Commission, and would serve a useful public purpose.
 The manner by which Congress intended the ICC to exercise its authority to grant exemptions is indicated both by the fact that the Commission was empowered to revoke an exemption found to be improvidently granted and by the following statement from the legislative history:
 These provisions give the Commission considerable flexibility to try innovative, experimental programs to determine exactly what kind of less stringent regulation may work. A great deal of economic theory has been propounded concerning what may occur if regulatory requirements are eased, but there is no empirical information available on what the results of such changes may be.
 H.R. Rep. No. 94-725, 94th Cong., 1st Sess. 243 (1975).
 
 
 [5]
 The Congress hereby finds that
 (1) historically, railroads were the essential factor in the national transportation system;
 (2) the enactment of the Interstate Commerce Act was essential to prevent an abuse of monopoly power by railroads and to establish and maintain a national railroad network;
 (3) today, most transportation within the United States is competitive;
 (4) many of the Government regulations affecting railroads have become unnecessary and inefficient;
 (5) nearly two-thirds of the nation's intercity freight is transported by modes of transportation other than railroads; ... and
 (9) modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation.
 
 
 [6]
 § 10505. Authority to exempt rail carrier transportation
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 (b) The Commission may, where appropriate, begin a proceeding under this section on its own initiative or on application by the Secretary of Transportation or an interested party.
 (c) The Commission may specify the period of time during which an exemption granted under this section is effective.
 (d) The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class or transportation is necessary to carry out the transportation policy of section 10101a of this title.
 (e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title.
 (f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as a part of a continuous intermodal movement.
 (g) The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.
 
 
 [7]
 See n.6, supra
 
 
 [8]
 TOFC/COFC service is a prime example of a continuous intermodal movement
 
 
 [9]
 Petitioners contend that when Congress used the word "transportation" in § 10505(f), it meant only rail transportation. The basis for this argument is that § 10505 is found in Subchapter I dealing with rail, rail-water, express, and pipeline carrier transportation of Chapter 105 of the Act. Because motor carrier transportation is covered by Subchapter II, petitioners argue that references to "transportation" in Subchapter I do not refer to motor carrier transportation regardless of whether such transportation is provided by a railroad or an independent motor carrier. While this argument has some appeal, it must fail. As noted in the text, "transportation" has been defined in the Act to include motor vehicle services; while some sections of the Act apparently do use the word only with reference to a single mode of transportation, e. g., § 10542, other sections contemplate the broader, statutory definition. E. g., § 10523
 
 
 [10]
 The ICC has instituted a proceeding, Ex Parte No. 230 (Sub-No. 6), in which it contends that § 10505(a) authorizes it to exempt not only motor carrier transportation of TOFC/COFC traffic in rail-owned trucks, but also such transportation provided by both rail-affiliated and independent motor carriers. That contention is not, of course, before us, and we express no opinion on the question of whether § 10505(a) reaches that far
 
 
 [11]
 49 U.S.C. § 10322(b)(2) provides:
 In any case involving an application for authority to provide motor carrier transportation incidental to trailer-on-flatcar or container-on-flatcar service by rail under subchapter II of chapter 109 of this subtitle, a final decision on such application shall be issued in writing not later than the 180th day following the date such application is filed with the Commission.
 
 
 [12]
 49 U.S.C. § 10922(j) provides: "A motor common carrier of property may deliver to or receive from a rail carrier a trailer moving in trailer-on-flat-car service at any point on the route of the rail carrier if the motor carrier is authorized to serve the origin and destination points of the traffic."
 49 U.S.C. § 10923(e) provides: "A motor contract carrier of property may deliver to or receive from a rail carrier a trailer moving in trailer-on-flat-car service at any point on the route of the rail carrier if the motor carrier is authorized to serve the origin and destination points of the traffic."
 
 
 [13]
 49 U.S.C. § 11344(e) provides:
 A rail carrier, or a person controlled by or affiliated with a rail carrier, together with one or more affected shippers, may apply for approval under this subsection of a transaction for the purpose of providing motor carrier transportation prior or subsequent to rail transportation to serve inadequately served shippers located on a railroad other than the applicant carrier. Such application shall be approved by the Commission if the applicants demonstrate presently impaired rail service and inadequate motor common carrier service which results in the serious failure of the rail carrier serving the shippers to meet the rail equipment or transportation schedules of shippers or seriously to fail otherwise to provide adequate normal rail services required by shippers and which shippers would reasonably expect the rail carrier to provide. The Commission shall approve or disapprove applications under this subsection within 30 days after receipt of such application. The Commission shall approve applications which are not protested by interested parties within 30 days following receipt of such application.
 
 
 [14]
 We note again the language of the Conference Report on the exemption provision of the Staggers Act:
 The bill permits exemptions wherever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition .... The conferees expect that, consistent with the policies of this Act, the Commission will pursue partial and complete exemptions from remaining regulation ... and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.
 H.R.Rep. No. 96-1430, 96th Cong., 2d Sess. 105, reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4137.
 
 
 [15]
 49 U.S.C. § 10741(b) provides: "A common carrier providing transportation or service subject to the jurisdiction of the Commission under chapter 105 of this title may not subject a person, place, port or type of traffic to unreasonable discrimination ...."
 
 
 [16]
 49 U.S.C. § 10101a(13) provides that "it is the policy of the United States Government to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination."
 
 
 [17]
 The Commission found that regulation of rail and rail-owned truck transportation of TOFC/COFC traffic was not necessary to carry out the transportation policy of 49 U.S.C. § 10101a or to protect shippers from the abuse of market power by railroads. There is no contention that TOFC/COFC service the second largest category of railroad carloadings is a service of limited scope
 
 
 [18]
 We note that the "competition" findings were not required by § 10505(a), which is satisfied if the Commission finds that regulation is not necessary to protect shippers from abuses of market power by railroads (and that regulation is not necessary to carry out the transportation policy of § 10101a). That this distinction was intended by Congress is evident from the legislative history of § 10505(a): "The bill permits exemptions wherever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition." H.R.Rep. No. 96-1430, 96th Cong., 2d Sess. 105, reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4137. The competition findings were, however, relied upon by the Commission as the basis for its finding that regulation is not necessary to prevent abuses of market power by railroads; we review them in that light
 
 
 [19]
 "Rail Rate Equalization To and From Ports," Rail Services Planning Office, Interstate Commerce Commission (Jan. 1979)
 
 
 [20]
 In addition, the Conference of the House and Senate Appropriations Committees has also directed the Commission to conduct a broader study of the Alaska Railroad's rates, including whether those rates cover the railroad's costs plus its subsidy. H.R.Rep. No. 96-1400, 96th Cong., 2d Sess. at 14
 The Commission has responded to the directives of Congress with studies concerning the Alaska Railroad's rates and costs. The first study was found to be inadequate and was supplemented by a second study submitted to Congress on June 15, 1981. While that study concludes that the Alaska Railroad's rates recover the cost of service and the federal subsidy, we do not find it dispositive of the question whether including the Alaska Railroad in the exemption comports with the transportation policy of § 10101a. Congress has yet to respond to the second study, the Alaska Railroad remains immune from antitrust liability, and its annual subsidy certainly provides it with a competitive advantage over its privately owned competitors.
 
 
 [21]
 As discussed earlier in this opinion, the exemption was granted pursuant to the Commission's authority under section 10505(a), rather than section 10505(f). Section 10505(a) does not limit the ICC's exemption authority to "transportation that is provided by a railroad" but, rather, authorizes exemptions in "matter(s) related to a rail carrier providing transportation ...." Whether section 10505(a) authorizes the Commission to exempt service provided by a water carrier is not before us, and, of course, we express no view on that issue; here the Commission argues that the exemption extends only to transportation provided by a rail carrier