**REGULAR COMMON CARRIER CONFERENCE, et al.,**
Petitioners,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Respondents,

Burlington Northern, Inc., et al., Transportation Lawyers Association, Intervenors. (Two Cases)

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS of AMERICA, et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Respondents,

Burlington Northern, Inc., et al., Transportation Lawyers Association, Intervenors.

Nos. 85–1601, 86–1222 and 86–1435.

United States Court of Appeals, District of Columbia Circuit.

Argued March 27, 1987.

Decided June 23, 1987.

Laura Layman and Kevin M. Williams, Washington, D.C., with whom Robert J. Higgins and Joan M. Darby were on the brief, for petitioners.

Timm L. Abendroth, Attorney, I.C.C., Washington, D.C., with whom Robert S. Burk, General Counsel, John J. McCarthy, Jr., Deputy Associate General Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attorneys, Dept. of Justice were on the brief, for respondents, I.C.C. and U.S.

Herbert J. Martin, Washington, D.C., for intervenor, Burlington Northern, Inc., et al.

James F. Flint and Robert Walker, Washington, D.C., entered appearances for intervenor, Transportation Lawyers Ass'n.

Before EDWARDS and STARR, Circuit Judges, and SWYGERT,* Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

We are asked to review three decisions of the Interstate Commerce Commission ("ICC" or the "Commission") exempting from statutory prior approval requirements a series of intermodal acquisitions involving rail and motor carriers. Because we conclude that the Commission applied the wrong statutory criteria in granting the exemption requests, we reverse and remand the Commission's decisions.

## I. BACKGROUND

These consolidated cases involve the acquisition of several trucking companies by Burlington Northern, Inc., a holding company that owns the Burlington Northern Railroad Company, a Class I railroad. In four separate petitions filed with the ICC during 1985 and 1986, both Burlington Northern, Inc. and its wholly-owned subsidiary Burlington Northern Motor Carriers, Inc. (hereinafter referred to collectively as "Burlington Northern") sought statutory exemptions in connection with their proposed acquisitions of six trucking companies. Absent exemptions, the acquisitions would have required prior ICC approval under 49 U.S.C. § 11343 *et seq.* (1982 & Supp. III 1985). In seeking to avoid the requirement of prior approval from the ICC, Burlington Northern petitioned for exemptions under 49 U.S.C. § 11343(e) (1982), which provides in relevant part:

> (e)(1) Notwithstanding any provisions of this title, the Interstate Commerce Commission, in a matter related to a motor carrier of property providing transportation subject to the jurisdiction of the

Commission under subchapter II of chapter 105 of this title, may exempt a person, class of persons, transaction, or class of transactions from the merger, consolidation, and acquisition of control provisions of this subchapter if the Commission finds that—

> (A) the application of such provisions is not necessary to carry out the transportation policy of section 10101 of this title; and

> (B) either (i) the transaction is of limited scope, or (ii) the application of such provisions is not needed to protect shippers from the abuse of market power.

*Id.* § 11343(e)(1). Section 10101, referenced in section 11343(e)(1), lists the overall goals of ICC transportation policy. *Id.* § 10101.

Burlington Northern's petitions for section 11343(e) exemptions were opposed by the Regular Common Carrier Conference ("RCCC"), the Transportation Lawyers Association ("TLA"), the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("IBT") and the American Trucking Association, Inc. Among their objections, the opposing parties claimed that the ICC may not act under section 11343(e) to exempt rail-motor acquisitions of the sort proposed by Burlington Northern, but must instead evaluate such acquisitions according to the requirements set forth in 49 U.S.C. § 10505 (1982):

> (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

> (1) is not necessary to carry out the transportation policy of section 10101a of this title; and

> (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

not needed to protect shippers from the abuse of market power.

....

(g) The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.

*Id.* § 10505(a), (g). Section 10101a, referenced in section 10505(a)(1), lists the specific goals of ICC *rail* transportation policy. *Id.* § 10101a.

In proceedings before the Commission, the opposing parties contended that the reference to "intermodal ownership" in section 10505(g)(1) included ownership of motor carriers by railroads, and thus included Burlington Northern's proposed acquisitions. Such ownership, they argued, is "otherwise prohibited" within the meaning of section 10505(g)(1) unless it satisfies the specific requirements of 49 U.S.C. § 11344(c) (1982), which states in relevant part:

> When a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transaction involves a motor carrier, the Commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition.

In other words, the opposing parties argued that, because section 10505(g)(1) prohibits the ICC from exempting a rail-motor acquisition that does not satisfy the requirements of section 11344(c), the ICC was statutorily obligated to apply the standards of section 11344(c) (and not the less stringent standards of section 11343(e)) in considering Burlington Northern's petitions.

In a series of three decisions, the ICC purported to invoke the provisions of section 11343(e) and granted all four of Burlington Northern's exemption petitions. In so doing, the ICC rejected the opposing parties' arguments regarding the over-riding applicability of section 11344(c). *See Burlington Northern, Inc.—Control Exemption—Victory Freightway Sys.,* ICC Docket No. MC–F–16248 (decided July 11, 1985; served July 26, 1985) (*"July 1985 Decision"*), *reprinted in* Joint Record Appendix ("J.R.A.") 1; *Burlington Northern, Inc.—Control Exemption—Victory Freightway Sys.,* ICC Docket No. MC–F–16248, *Burlington Northern, Inc.—Control Exemption—Monkem Co.,* ICC Docket No. MC–F–16372, and *Burlington Northern, Inc.—Control Excemption—Monroe Trucking,* ICC Docket No. MC–F–16452 (decided Jan. 29, 1986; served Feb. 13, 1986) (*"January 1986 Decision"*), *reprinted in* J.R.A. 9; *Burlington Northern, Inc. and Burlington Northern Motor Carriers, Inc.—Control Exemption—Stoops Express, Inc., Wingate Trucking Co., and Taylor-Maid Transp.,* ICC Docket No. MC–F–17030 (decided July 18, 1986; served July 28, 1986) (*"July 1986 Decision"*), *reprinted in* J.R.A. 22.

In the *July 1985 Decision,* the ICC rejected by a 4–3 vote the argument that the "intermodal ownership" limitation of section 10505(g)(1) compelled the Commission to apply section 11344(c) to the transactions at issue. The majority added that even if section 10505(g)(1)—and thus section 11344(c)—*were* applicable, Burlington Northern's proposed acquisition would satisfy the requirements of section 11344(c). However, the majority offered only a cursory explanation of the basis for this alternative holding. *July 1985 Decision* at 5, *reprinted in* J.R.A. 5.

In the *January 1986 Decision,* a bare majority of the Commission again rejected the statutory construction offered by the parties opposing Burlington Northern's petition, declaring that "[t]he factors enumerated in section 11344(c) are subsumed within the broader competitive analysis we conduct in rail-motor acquisitions" under section 11343(e). *January 1986 Decision* at 7–8, *reprinted in* J.R.A. 15–16. In addition, however, the majority very briefly considered each of the section 11344(c) factors and concluded that they were satis-

fied. *Id.* at 10–11, *reprinted in* J.R.A. 18–19.

In the *July 1986 Decision*, the same majority approved Burlington Northern's remaining petitions, adhering to its previous position on the applicability of section 11343(e). This time, however, the majority retreated from the position it had taken in January of 1986—that the factors enumerated in section 11344(c) were "subsumed" within the criteria of section 11343(e). Instead, the majority stated: "[W]e no longer believe the criteria under that section [11344(c)] are relevant in evaluating whether transactions such as those involved here meet the *exemption* criteria under section 11343(e)." *July 1986 Decision* at 5 n. 3, *reprinted in* J.R.A. 26 (emphasis in original). The majority concluded that because "the primary impact of the proposed rail-motor transaction can be expected to be on the motor carrier industry rather than on the rail industry," the Commission should apply section 11343(e) rather than section 10505. *Id.* at 5, *reprinted in* J.R.A. 26.

Besides making it unnecessary for the ICC to address the specific criteria of section 11344(c), the granting of Burlington Northern's exemption requests under section 11343(e) had two additional consequences. First, it indisputably conferred on the transactions immunity from antitrust laws. 49 U.S.C. § 11341(a) (1982). Second, it left to the ICC's discretion the decision whether to impose labor protective conditions on any of the parties to the transaction. *Id.* § 11343(e)(4). In contrast, in acquisitions to which sections 10505(g)(1) and 11344(c) apply, labor protection for rail employees is mandatory, *id.* §§ 10505(g)(2), 11347 (1982 & Supp. III 1985), and the ICC has taken the position that antitrust immunity is unavailable.[1] *January 1986 Decision* at 6, *reprinted in* J.R.A. 14. Because of these different substantive consequences, the ICC's alternative holdings in the July 1985 and January 1986 decisions, although arguably predicated on section 11344(c) findings, did not transform the section 11343(e) exemptions into the equivalent of section 10505 exemptions.

## II. ANALYSIS

Two of the groups that opposed Burlington Northern's petitions below—the RCCC and the IBT (joined by the TLA as an intervening petitioner)—have petitioned this court to review each of the ICC's decisions, contending that the Commission has no authority to exempt rail-motor acquisitions under section 11343(e). The ICC and the carriers intervening on its behalf contend that the ICC may exempt a rail carrier's acquisition of a trucking company under *either* section 10505 *or* section 11343(e). As explained below, however, a straightforward analysis of the relevant statutes leads us to conclude that the ICC's position is untenable.

### A. *The Meaning of Section 10505(g)*

We begin with the language of section 10505(g). The term "intermodal ownership" in subsection (g)(1) is clearly broad enough to include rail-motor acquisitions within its literal scope, and nothing in section 10505 or elsewhere in the statute suggests that the term should be given a narrowing construction. The Commission contends that "intermodal" includes rail-water acquisitions and "perhaps" freight forwarder acquisitions of other carriers, but that it does *not* include rail-motor acquisitions. Joint Brief for ICC and United States at 32 n. 20. However, this construction is flatly belied by the plain words of the statute itself, and there is nothing in the legislative history of section 10505(g) to suggest that Congress intended something narrower than the literal meaning of the term "intermodal." Therefore, we cannot accept the ICC's strained interpretation of section 10505(g).

Indeed, at oral argument, counsel for the Commission conceded that, in the absence of section 11343(e), section 10505(g)(1) would *undoubtedly* apply to the rail-motor

---

**1.** Because no party has placed the question at issue, we venture no opinion as to the correctness of the ICC's conclusion that acquisitions to which sections 10505(g)(1) and 11344(c) apply are not immune from antitrust scrutiny.

acquisitions in question. Such acquisitions are "otherwise prohibited" for purposes of section 10505(g) *unless* they satisfy the section 11344(c) criteria. Consequently, ICC counsel conceded that, absent section 11343(e), the Commission would be compelled to evaluate the acquisitions under the criteria of section 11344(c). All parties agree that the criteria under section 11344(c) are more stringent than those of section 11343(e). And, as we have already observed, the application of sections 10505(g)(1) and 11344(c) instead of section 11343(e) would also have significant consequences with respect to labor protection and, according to the ICC, to antitrust immunity as well.

### B. *The Relationship Among Sections 11343(e), 10505(g)(1) and 11344(c)*

In light of the foregoing, it appears that the principal question before this court is whether, by enacting section 11343(e), Congress intended to repeal or modify all or part of sections 10505(g)(1) and 11344(c). We think it is absolutely clear that Congress did not. In reaching this conclusion, we find a number of factors that weigh against inferring such an intent.

#### 1. *The Plain Meaning of the Statute*

Beginning, as we must, with the plain language of the statute, we note that nothing in the literal terms of section 11343(e) indicates that it was intended to override section 10505(g)(1) or section 11344(c). Indeed, while section 11343(e)(1) applies *generally* to a "matter related to a motor carrier of property," section 10505(g)(1) applies *specifically* to "intermodal ownership," and section 11344(c) applies *specifically* "[w]hen a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transaction involves a motor carrier." Whereas the phrase "matter related to a motor carrier of property" in section 11343(e) is ambiguous as to whether it includes only matters in which *all* participants are motor carriers, or all matters that involve at least *one* motor carrier, the far more precise language in sections 10505(g)(1) and 11344(c) *expressly* encompasses rail-motor transac-

tions. It is difficult to imagine that Congress would silently withdraw an entire class of transactions from the scope of sections 10505(g)(1) and 11344(c) by enacting a new statutory provision that does not even clearly *include* that class of transactions.

Thus, the literal terms of sections 10505(g)(1) and 11344(c) apply to rail-motor transactions, and nothing in the literal terms of section 11343(e) indicates congressional intent to modify or partially repeal sections 10505(g)(1) and 11344(c) or to offer the ICC an alternative to proceeding under those statutes. Nor do we find in the legislative history of section 11343(e) the "clearly expressed legislative intention to the contrary" which would be needed to call into question the clear import of the statute's language and structure. *Burlington Northern R.R. v. Oklahoma Tax Comm'n,* — U.S. —, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987). On the contrary, while our holding is based on the literal language of the statutory provisions at issue, a brief survey of the relevant parts of the legislative history will serve to confirm our conclusion that the ICC's interpretation of section 11343(e) is erroneous.

#### 2. *The Legislative History of Section 11343(e)*

The motor carrier exemption embodied in section 11343(e) was originally proposed by former ICC Chairman Reese Taylor in Senate hearings on the Bus Regulatory Reform Act of 1982, Pub.L. No. 97–261, 96 Stat. 1102. At the hearings, Taylor stated on behalf of the Commission:

> We believe that it would be preferable to exempt *bus companies and motor carriers generally* from Commission jurisdiction with regard to mergers, consolidations and acquisitions of control. This change is suggested because we believe that other governmental bodies have sufficient jurisdiction to protect the public interest.
>
> In view of liberalized entry, the number of merger proposals has substantially declined and continued regulation by the Commission of control and acquisi-

tion transactions no longer appears necessary. Alternatively, Congress might wish to consider adoption of an exemption along the lines of the Staggers [Rail] Act [of 1980, Pub.L. No. 96–448, 94 Stat. 1895], which could be used to exempt *those types of transaction[s].*

*Deregulation of the Intercity Bus Industry: Hearings on H.R. 3663 Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science and Transportation,* 97th Cong., 2d Sess. 88 (1982) (emphasis added). The Senate adopted Taylor's second alternative, but narrowed it to exempt only "motor carriers of property," thus excluding buses from the exemption. *See* S.REP. No. 411, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.CODE CONG. & ADMIN.NEWS 2308, 2338. The Senate Report explained that the proposed exemption would "allow[ ] the ICC the discretion to exempt small truck company mergers and other transactions from certain statutory requirements." *Id.* at 13, *reprinted in* 1982 U.S.CODE CONG. & ADMIN. NEWS at 2320. Given that Chairman Taylor's proposal addressed motor carriers *only,* and given also that the Senate then narrowed his proposal still further to include only a particular *type* of motor carrier, it strains credulity to suggest, as the intervening respondents do, that the Senate Report's oblique reference to "small truck mergers *and other transactions*" reflects an otherwise unarticulated intent to *open up* this same exemption provision to encompass transactions involving an entire class of carriers *other* than motor carriers. Surely such a broad proposal would have evoked at least *some* commentary; yet the legislative history reveals none. The intervening respondents' suggestion proves even more doubtful when contrasted with the Senate's statement that the proposed exemption would "not in any way affect the ICC's jurisdiction with regard to rail transactions under Subchapter III [of Chapter 113] of Title 49 U.S.C." *Id.* at 31, *reprinted in* 1982 U.S.CODE CONG., & ADMIN.NEWS at 2338. Thus, nothing in the Senate history of section 11343(e) suggests

that the "motor carrier of property" exemption was intended to override the preexisting statutory provisions that were, and are, *expressly* applicable to rail-motor ownership. It is difficult to believe that a Senate intending to amend a prior enactment would not only employ statutory terms more ambiguous than the terms of the enactment it intended to amend, but would also fail to clarify its amendatory intent anywhere in the legislative history.

When the House took up the Senate's proposed exemption, the ICC once again took a position in favor of either eliminating Commission jurisdiction over motor carrier acquisitions or allowing the ICC to exempt such transactions under certain circumstances. In a letter addressed to the Chairman of the House Committee on Public Works and Transportation, Chairman Taylor reiterated that the ICC "recommended elimination of ICC jurisdiction over motor carrier mergers, consolidations and acquisitions of control," or, "[a]lternatively, ... adoption of an exemption provision." Letter from Reese H. Taylor, Jr., Chairman, Interstate Commerce Commission, to Hon. James J. Howard, Chairman, House Committee on Public Works and Transportation (June 8, 1982), *reprinted in* Brief of Petitioners, Addendum B. As in his previous Senate testimony, Chairman Taylor's juxtaposition of the proposal to eliminate jurisdiction over acquisitions *among* motor carriers with the alternative proposal to create "an exemption" strongly suggests that the "exemption" proposed in his letter was similarly circumscribed. Nowhere in this letter did the Chairman suggest exempting rail-motor (or other intermodal) acquisitions.

The House Conference Report proposed retaining the Senate's exemption and repeated the Senate Report's statement that this exemption would not affect the ICC's rail jurisdiction. H.R. CONF.REP. No. 780, 97th Cong., 2d Sess. 56, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 2342, 2367. Shortly before the compromise bill was passed by both houses, Congressman Anderson, who was the House sponsor of

the bill and a member the Conference Committee, made the following statement on the floor of the House:

> For motor carriers of property, the conference agreement treats truck mergers differently than mergers of buses. Specifically, the agreement would retain existing law *for truck mergers,* except that the Commission could exempt a person, class of persons, transaction, or class of transactions *for motor carriers of property* from the provisions of the law if the Commission finds that the application of these provisions is not necessary or [the transaction is] of limited scope.

128 CONG.REC. H6692 (daily ed. Aug. 19, 1982) (statement of Rep. Anderson) (emphasis added). Consistent with both the recommendations of Chairman Taylor and the relevant passages in the Senate and Conference Reports, Congressman Anderson's statement strongly suggests that the exemption was to apply only to transactions among motor carriers.

In short, the legislative history of section 11343(e) offers *no* support for the ICC's interpretation. We find no evidence from which to conclude that the phrase "matter related to a motor carrier" as used in that section was intended to encompass rail-motor acquisitions, and we find rather strong suggestions to the contrary. Indeed, to construe that phrase as the ICC suggests without any clear basis in the language of section 11343(e) would be to work a partial repeal by implication of sections 10505(g)(1) and 11344(c). To draw such an inference without any clear evidence of congressional intent would violate the settled rule that repeals by implication are disfavored:

> Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.
>
> The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possi-

ble.... The intention of the legislature to repeal 'must be clear and manifest.'"

*Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (citations omitted) (quoting *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. at 182, 188, 84 L.Ed. 181 (1939) (quoting *Red Rock v. Henry,* 106 U.S. (16 Otto) 596, 602, 27 L.Ed. 251 (1882))); *see International Bhd. of Teamsters v. ICC,* 801 F.2d 1423, 1430 (D.C.Cir.1986). As the preceding discussion indicates, there is no "clear and manifest" evidence of congressional intent to repeal all or part of either section 10505(g)(1) or section 11344(c). Thus, we conclude that the plain language of sections 10505(g)(1) and 11344(c) is controlling, and therefore the ICC must apply both of these statutory provisions to the transactions at issue.

### 3. *The "Notwithstanding" Phrase in Section 11343(e)*

Almost as a last gasp effort to bolster its strained argument regarding the meaning of section 11343(e)(1), the Commission cites the preface to that section as somehow determinative of the issues before us. The preface to section 11343(e)(1) reads "[n]otwithstanding any provisions of this title." As best we can tell, the Commission appears to claim that this language shows *either* a congressional intention to amend or override the statutory provisions that otherwise govern intermodal transactions involving one or more motor carriers, *or* a congressional intention to allow the Commission to choose between two alternative statutory procedures for approving rail-motor transactions. We find both of these contentions to be specious, with the former reflecting nothing more than a failed attempt to recast the repeal-by-implication argument and the latter reflecting an utterly baseless claim that can find no support in the terms of the statute, its legislative history or common sense.

The frailty of the Commission's argument on the "notwithstanding" phrase is highlighted by the fact that the Commission appears to offer mutually exclusive justifications to support it. In other words,

if sections 10505(g)(1) and 11344(c) have been repealed or overridden by section 11343(e), then these provisions cannot be viewed as *alternative* procedures for the consideration of petitions involving rail-motor acquisitions. The ICC has failed to clarify whether its position rests on only one of these interpretations or on both. Moreover, *both* of these arguments are inconsistent with the ICC's third argument, which we have already rejected, that the "intermodal" language in section 10505(g)(1) was never intended to include rail-motor acquisitions in the first place. Thus, the Commission's interpretation of the relevant statutory provisions is at best ambiguous and at worst makes a mockery of the statutory scheme enacted by Congress.

Even if we could resolve the ambiguities in the Commission's position, we would still reject it as inconsistent with congressional intent clearly expressed in the language and structure of the statute. It is clear that in these circumstances courts need not defer to administrative agencies on purely legal questions, *see UAW v. Brock*, 816 F.2d 761, 764–65 (D.C.Cir.1987), and the issue regarding the meaning of the preface in section 11343(e)(1) is just such a question. Recently, in *Immigration & Naturalization Service v. Luz Marina Cardoza-Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the Supreme Court recognized this principle in refusing to defer to a statutory interpretation advanced by the Immigration and Naturalization Service; the Court's holding in *Cardoza-Fonseca* is directly relevant to the instant case:

> The narrow legal question whether the two standards are the same is, of course, quite different from the question of interpretation that arises in each case in which the agency is required to apply either or both standards to a particular set of facts. There is obviously some ambiguity in a term like "well-founded fear" which can only be given concrete meaning through a process of case-by-case adjudication. In that process of filling "'any gap left, implicitly or explicitly, by Congress,'" the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program. But our task today is much narrower, and is well within the province of the judiciary. We do not attempt to set forth a detailed description of how the well-founded fear test should be applied. Instead, we merely hold that the Immigration Judge and the [Board of Immigration Appeals] were incorrect in holding that the two standards are identical.

*Id.* at 1221–22 (footnotes and citations omitted) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (quoting *Morton v. Ruiz*, 414 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974))). It is this same "narrower" task that we undertake here, where we examine the correctness not of an agency's *application* of a particular set of statutory criteria to a particular set of facts, but the agency's determination of *which* set of statutory criteria Congress intended it to apply.

One obvious view of the "notwithstanding" language is that, read together with the phrase "matter related to a motor carrier of property," the introductory phrase refers to those provisions of Title 49 that deal with matters involving only motor carriers of property, not to those provisions that apply to intermodal transactions. Viewed from this perspective, the "notwithstanding" phrase simply does not refer to section 10505(g)(1) at all. Such an interpretation is supported by the literal language of section 11343(e), is not contradicted by its legislative history, and indeed is consistent with the evidence in the legislative history of congressional intent to effect regulatory changes only *within* the motor carrier industry.

The ICC seeks to avoid this obvious construction by arguing that the "notwithstanding" language in section 11343(e) reflects Congress' intent to give the ICC a *choice* between two *alternative* routes for approving rail-motor transactions. In other words, the ICC argues that when it

considers a proposal to exempt a rail-motor transaction, the Commission has the discretion to apply either the statutory provisions that mandate rail labor protection and arguably provide no antitrust immunity—sections 10505(g)(1) and 11344(c)—or the statutory provision that confers antitrust immunity and leaves to the ICC the decision whether to impose labor protection—section 11343(e). Even assuming, *arguendo*, that section 11343(e) could apply to intermodal transactions, we can find no support in the statute or the legislative history for the ICC's claim that Congress gave to the *Commission* the discretion to decide which statutory provisions to invoke in any given case. Congress certainly did not indicate on what *basis* the ICC should prefer one approach to the other. Indeed, in the course of this litigation, the ICC has itself taken inconsistent positions, arguing in one breath that it will make the choice based on "whether the primary impact of the transaction (given the ICC's regulatory responsibilities) is on the railroad or the motor carrier industry," Joint Brief for ICC and United States at 30, and in the next breath that it will "be guided by the substantive differences in the provisions as they might apply in a particular situation," *id.* at 31. These are very different criteria. Even if the ICC could offer a coherent and consistent explanation of the basis upon which it would choose the operative statute, it makes no sense to contend, as the Commission does, that an agency is free to pick and choose between statutory provisions on any ground it sees fit, with no congressional guidance and no rulemaking authority. *Cf. Morton v. Mancari,* 417 U.S. at 550–51, 94 S.Ct. at 2483. The ICC has offered no evidence whatsoever that Congress intended to give the Commission a free hand in choosing the operative statute. Absent any evidence in support of this novel proposition, the most sensible conclusion is that Congress did not intend to give the ICC such a remarkable degree of discretion.

## C. *Controlling Principles of Statutory Construction*

The Supreme Court has reminded us that, in employing traditional tools of statu-

tory construction, we must consider the language and overall structure of a statute, and its legislative history, to determine congressional intent. *See Block v. Community Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 3455, 81 L.Ed.2d 270 (1984). This is a common-sense approach to statutory construction, and it admits of easy application in this case: First, the literal terms of the statute itself and its overall structure (*i.e.,* embodying *different* procedures for the consideration of petitions involving "matter[s] related to a motor carrier of property" as opposed to those involving "intermodal ownership") belie the Commission's strained attempt to nullify sections 10505(g)(1) and 11344(c); second, there are *no* indications either in the statute or its legislative history suggesting that Congress intended to repeal, override, limit or amend sections 10505(g)(1) and 11344(c) with the enactment of section 11343(e)—indeed, all of the legislative history is to the contrary; third, the Commission's proposed construction of the statute seeks to rely on a general statutory provision to nullify a specific one, and it fails to give full effect to all relevant provisions of the statute; and, finally, there is nothing in the statute or its legislative history indicating that Congress intended to give the ICC unbridled discretion to choose between the application of section 11343(e) and sections 10505(g)(1) and 11344(c) in its consideration of rail-motor acquisitions. With these considerations in mind, we reject the Commission's position because it is plainly at odds with every principle of statutory construction that is pertinent to this case. The simple point here is that the Commission has no authority to bypass the requirements of sections 10505(g)(1) and 11344(c) with respect to rail-motor acquisitions.

Although the ICC purported to make alternative findings under section 11344(c) in the *July 1985 Decision* and the *January 1986 Decision,* we reject these findings as inadequate. For one thing, the Commission's position changed significantly from one decision to the next, so we have no assurance of any clear basis for the rulings here under challenge. Furthermore, the

so-called alternative findings were supported with only cursory analysis, far short of what would be sufficient to permit informed judicial review. Finally, even the ICC acknowledges that the substantive consequences of proceeding under sections 10505(g)(1) and 11344(c) are critically different from the consequences of a determination under section 11343(e). For these reasons, we cannot uphold the decisions of the ICC. Accordingly, we grant the petitions for review, reverse the decisions of the Commission granting Burlington Northern's exemption requests, and remand these matters for reconsideration solely under sections 10505 and 11344(c).

*So ordered.*