924 F.2d 1099
 288 U.S.App.D.C. 142
 CENTRAL STATES MOTOR FREIGHT BUREAU, INC., et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, et al., Intervenors.
 No. 90-1008.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 19, 1990.
Decided Feb. 1, 1991.
Rehearing and Rehearing En Banc
Denied March 28, 1991.
 
 J. Elliott Bunce, with whom John W. McFadden, Jr., Arlington, Va., Bryce Rea, Jr., William E. Kenworthy and Kevin M. Williams, Washington, D.C., were on the brief, for petitioners.
 Louis Mackall, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, and Craig M. Keats, Deputy Associate Gen. Counsel, I.C.C., James F. Rill, Asst. Atty. Gen., Robert B. Nicholson and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Frederic L. Wood and Nicholas J. DiMichael, Washington, D.C., for The Nat. Indus. Transp. League, John C. Fudesco for Pennsylvania Truck Lines, Inc., Ronald N. Cobert and Andrew M. Danas, Washington, D.C., for Intermodal Marketing Ass'n, Robert W. Blanchette and John B. Norton, Washington, D.C., for Ass'n of American Railroads were on the joint brief for intervenors. J. Thomas Tidd, Washington, D.C., for American Ass'n of Railroads, Robert L. Cope and Joseph Michael Roberts for Intermodal Marketing Association, and Richard D. Fortin, Washington, D.C., for Nat. Indus. Transp. also entered appearances for intervenors.
 Before: RUTH BADER GINSBURG, SILBERMAN and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.
 Dissenting Opinion filed by Circuit Judge SILBERMAN.
 RUTH BADER GINSBURG, Circuit Judge:
 
 
 1
 In "trailer-on-flat car" ("TOFC") or "piggyback" operations, trailers containing freight are pulled by motor carrier from the shipper to the rail ramp, moved by rail to the destination rail ramp, and then taken to their ultimate destination by motor carrier. "Container-on-flat-car" ("COFC") operations are similar, differing only in that at least one leg of the journey is by water. Two previous rulemakings by the Interstate Commerce Commission ("ICC" or "Commission") exempted from economic regulation all TOFC/COFC rail service and some types of TOFC/COFC motor operations. In this appeal, petitioner rate bureaus and motor carrier associations (collectively, "Central States") challenge the most recent ICC rulemaking on TOFC/COFC service, which exempts from economic regulation virtually all remaining motor pickup and delivery service.[1] See Improvement of TOFC/COFC Regulations (Pickup and Delivery), Ex Parte No. 230 (Sub-No. 7), 6 I.C.C.2d 208 (1989) ("Sub-No. 7"). We hold that the ICC's construction of the relevant statutory provisions is permissible and accordingly deny Central States' petition for review.
 
 I.
 
 2
 The ICC's current exemption authority stems from section 207 of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), Pub.L. No. 94-210, 90 Stat. 31 (codified at 49 U.S.C. Sec. 12(1)(b) (1976)) (recodified at 49 U.S.C. Sec. 10505(a) (Supp. III 1979)).[2] This provision of the 4-R Act authorized the Commission to issue an exemption from economic regulation only in matters of "limited scope." Furthermore, before it could exempt matters even of limited scope, the Commission had to determine that regulation was unnecessary to further the national transportation policy, placed an unreasonable burden on a person, class of persons, or commerce, and served "little or no useful public purpose." These restrictions upon the Commission's exemption authority prevented any broad deregulatory reforms.[3]
 
 
 3
 The Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895, eased the exemption requirements of section 10505(a). That section now provides:
 
 
 4
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle--
 
 
 5
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 
 
 6
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 
 
 7
 49 U.S.C. Sec. 10505(a) (emphasis added). While the Staggers Act retained the "limited scope" criterion, the word "or" in section 10505(a)(2) has made such a finding no longer mandatory. The Commission's focus in exemption cases has shifted to the second criterion--the potential for abuses of market power.
 
 
 8
 Not surprisingly, the ICC has responded to the relaxed statutory criteria by exercising its exemption power more actively. In 1981, it exempted the rail portion of TOFC/COFC transportation, as well as the motor carrier portions when accomplished in trucks owned or leased by the railroad. See Improvement of TOFC/COFC Regulation, Ex Parte No. 230 (Sub-No. 5), 364 I.C.C. 731 (1981) ("Sub-No. 5 "), aff'd sub nom. American Trucking Ass'ns v. ICC, 656 F.2d 1115 (5th Cir.1981). The Commission extended this exemption in 1987 to cover TOFC/COFC operations performed by a motor carrier either as the agent or as the joint-rate partner of the railroad. See Improvement of TOFC/COFC Regulations (Railroad-Affiliated Motor Carriers and Other Carriers), Ex Parte No. 230 (Sub-No. 6), 3 I.C.C.2d 869 (1987) ("Sub-No. 6 ").
 
 
 9
 In this appeal, Central States argues that the Commission has exercised its power too actively. The remaining motor pickup and delivery service that the Commission exempted in Sub-No. 7, according to Central States, is not "related to a rail carrier providing transportation." Central States also maintains that the exemption is inconsistent with the legislative history and various provisions of the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793. Central States' most serious challenge concerns section 10505(f), a provision added by the Staggers Act:
 
 
 10
 (f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.
 
 
 11
 According to Central States, this provision limits the Commission's exemption authority in matters intermodal to transportation "provided by a rail carrier." Thus, Central States concludes, the ICC had no statutory authority to deregulate motor freight TOFC/COFC operations that are not "provided by a rail carrier."[4]
 
 II.
 
 12
 In considering Central States' various challenges, we accord the Commission deference under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and uphold its decision so far as it is based on a permissible construction of the relevant statutory provisions. See id. at 843, 104 S.Ct. at 2781. In so doing, we reject Central States' arguments that deference is inappropriate because section 10505 is "jurisdictional," and that a reviewing court need not defer to agencies on "purely legal questions."[5]
 
 
 13
 Central States is correct that courts, on occasion, have resisted assigning heavy weight to an agency's interpretation of a statute typed "jurisdictional." The matter, however, remains "unsettled in this circuit." Otis Elevator Co. v. Secretary of Labor, 921 F.2d 1285, 1288 (D.C.Cir.1990); see also Business Roundtable v. SEC, 905 F.2d 406, 408 (D.C.Cir.1990) (noting substantial authority on both sides of the question). We leave this issue untouched in this opinion, for we do not regard section 10505 as "jurisdictional" for Chevron purposes. Exercise of the ICC's section 10505 exemption authority neither lodges nor dislodges agency jurisdiction; instead, it presupposes ICC jurisdiction over the persons or services exempted.
 
 
 14
 Nor can we accept Central States' argument that we need not and ought not accord respect to the Commission's resolution of "purely legal" issues. The decision Central States deems controlling, Regular Common Carrier Conference v. United States, 820 F.2d 1323 (D.C.Cir.1987), held only that a reviewing court need not defer to an agency's interpretation of a purely legal issue where it is "inconsistent with congressional intent clearly expressed in the language and structure of the statute." Id. at 1330. For reasons expressed below, we think that circumstance does not obtain here.
 
 III.
 
 15
 We have little difficulty in affirming the Commission's determination that the pickup and delivery services at issue are "related to a rail carrier providing transportation" within the meaning of section 10505(a). See supra p. 1101. The very point of the motor carrier pickup and delivery services at issue is to allow shippers to take advantage of the efficiencies that rail TOFC/COFC offers. See Sub-No. 7, 6 I.C.C.2d at 213; see also American Trucking Ass'ns, 387 U.S. at 420, 87 S.Ct. at 1620 ("TOFC service is inherently bimodal in that its basic characteristic is the combination of the inherent advantages of rail and motor transportation.") (quoting Piggyback, 322 I.C.C. at 329); 44 Fed.Reg. at 49279 (Aug. 22, 1979) (advance notice of proposed rules in Sub-No. 5, referring to the cost, energy, safety, and ecological benefits of rail transportation). The Commission has exempted motor carrier pickup and delivery from regulation only where it is performed immediately before or after a TOFC/COFC movement by rail, and where the rail and motor carrier legs are linked by an equipment interchange agreement.[6] See Sub-No. 7, 6 I.C.C.2d at 213-14. The Commission reasonably concluded that the exempted motor carrier operations are closely related to TOFC/COFC rail transportation, even though the rail and motor carrier segments are contracted for and billed separately.
 
 
 16
 Central States argues further that the Commission's interpretation of section 10505 is inconsistent with the Motor Carrier Act of 1980 ("MCA") in two respects. First, Central States observes, during floor debate over the MCA, the Senate deleted a committee amendment that, like the ICC exemption at issue, would have deregulated trucking that was incidental to rail freight transportation. See 126 CONG.REC. 7825-27 (1980). The Commission, Central States argues, therefore could not rely upon the Staggers Act--a statute governing railroads, enacted in the same year as the MCA--to deregulate the same sphere of commerce that Congress specifically refused to deregulate in the MCA.
 
 
 17
 We do not find this argument persuasive. The fact that Congress declined to provide for immediate deregulation of incidental-to-rail trucking does not indicate that Congress meant to withhold from the ICC permission under the Staggers Act to do so after ten years of experience with progressive deregulation of intermodal operations. Indeed, the legislative history of the Staggers Act indicates that Congress considered the ICC better-placed to make eventual decisions concerning the sectors of transportation fit for deregulation. See H.REP. NO. 1430, 96th Cong., 2d Sess. 105 (1980) (conference report).
 
 
 18
 The legislative history of the MCA offers support for this view. Senator Cannon, a floor manager of the MCA, argued against immediate deregulation because, in his words, "the record is not sufficient for the Senate to make a final judgment." Senator Cannon continued: "I suspect that when the committee has a chance to look at this [deregulatory] provision that it may find it to be highly meritorious. But I do think we need more time and more testimony before we drive into this matter." 126 CONG.REC. 7826 (1980). Moreover, Senator Cannon urged that since the rail portions of intermodal service had not yet been deregulated, the proposed trucking deregulation provision would leave piggyback transportation half-regulated and half-deregulated.[7] Id. Senator Hollings echoed this concern, and added that, in his judgment, the provision would go beyond incidental-to-rail trucking to deregulate shipments of dangerous commodities. Id. at 7827.
 
 
 19
 In short, the Senate seems to have rejected immediate deregulation in the MCA not because it considered deregulation of incidental-to-rail trucking bad policy, but because it believed that the issue had not been sufficiently studied, that the Senate was not well-placed to make the decision, and that incidental-to-rail trucking should not be deregulated while rail service was still regulated. TOFC/COFC rail service has now been deregulated, and the ICC has had a decade of experience with TOFC/COFC deregulation. As the ICC points out, Central States' interpretation of section 10505 would leave rail TOFC/COFC deregulated and motor carrier pickup and delivery still substantially regulated; this interpretation would create a "mirror image" of the half-regulated, half-deregulated system against which Senators Cannon and Hollings counseled. The Senate debate over the MCA thus appears to us to bolster, rather than to weaken, the ICC's interpretation of section 10505.
 
 
 20
 Central States argues that the Commission's exemption will "moot" or "nullify" provisions of the MCA that liberalized TOFC motor carrier licensing procedures. See 49 U.S.C. Secs. 10322(b)(2), 10922(k), 10923(b). We are not persuaded that the ICC's exercise of its exemption authority genuinely conflicts with these provisions. Section 10322(b)(2) requires the ICC to rule within 180 days on applications to provide motor service incidental to TOFC/COFC operations. The effect of the Commission's order is simply to make such applications unnecessary, unless the Commission revokes its exemption under section 10505(d), and except as to "Plan I" service, which the Commission's order did not deregulate (see supra note 1). The Commission could reasonably interpret section 10322(b)(2)--which was enacted before the Staggers Act broadened section 10505(a) to permit large-scale exemptions--as applicable only so far as the Commission's exemption authority lies dormant.
 
 
 21
 Similarly, we do not read sections 10922(k) and 10923(b) to conflict with the Commission's exemption order. Under sections 10922(k) and 10923(b), any motor carrier that is "authorized to serve the origin and destination points" of a TOFC/COFC route may pick up or deliver trailers at any point on that route. One effect of the ICC's deregulation order is to authorize all motor carriers to serve the origin and destination points of any TOFC/COFC route (except as regards Plan I service). Sections 10922(k) and 10923(b) would then authorize such carriers to pick up and deliver at any point on a TOFC/COFC route. This coincides precisely with the Commission's deregulation order.
 
 IV.
 
 22
 Central States' most substantial argument concerns the structural relation between sections 10505(a) and 10505(f). Section 10505(a), it contends, is merely the general source of the ICC's exemption authority over the railroads. Section 10505(f), by contrast, refers to piggyback operations specifically, providing that
 
 
 23
 [t]he Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.
 
 
 24
 49 U.S.C. Sec. 10505(f) (emphasis added). Central States argues that subsections (a) and (f), taken together, indicate that Congress specifically intended to authorize the ICC to exempt only the fraction of TOFC motor transportation that is "provided by a rail carrier." Thus, according to Central States, the "plain meaning" of subsections (a) and (f) bars the Commission from exempting TOFC motor traffic that, as in the case before us, is not provided by a rail carrier.
 
 
 25
 The standard against which we evaluate this argument is stated in Chevron, 467 U.S. at 842-45, 104 S.Ct. at 2781-83. In the first step of Chevron analysis, a reviewing court must determine, using "traditional tools of statutory construction," id. at 843 n. 9, 104 S.Ct. at 2782 n. 9, whether Congress has "directly spoken to the precise question at issue." Id. at 842, 104 S.Ct. at 2781. If Congress "had an intention on the precise question at issue," id. at 843 n. 9, 104 S.Ct. at 2782 n. 9, then "the court ... must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781-82.
 
 
 26
 The Supreme Court indicated in Chevron itself that it meant the term "precise question at issue" to be interpreted tightly. In that case, the Court reviewed an EPA regulation that interpreted the statutory term "stationary source" to refer to all pollution-emitting devices at a single plant, as if they were encased in a single "bubble." The Court did not focus on whether Congress had expressed any intention regarding the meaning of the general statutory term, "stationary source." Rather, it considered, more pointedly, whether "Congress ... actually ha[d] an intent regarding the applicability of the bubble concept to the [statutory] program." 467 U.S. at 845, 104 S.Ct. at 2783 (emphasis added). By narrowing the question at issue, the Court reduced the opportunities for a reviewing court to substitute its own interpretation for that of the agency. Under "Chevron Step I," a court is entitled to supplant an agency's interpretation only where Congress clearly intended another interpretation, in the precise circumstances that the agency's action presents. Here, the "precise question at issue" is whether Congress has "directly" and "unambiguously" expressed its intention regarding ICC deregulation of motor TOFC transportation that is not provided by a rail carrier. We think that it has not.
 
 
 27
 Nowhere in section 10505 did Congress explicitly address motor TOFC transportation not provided by a rail carrier; the terms of subsection (f) provide only that the Commission may deregulate TOFC transportation that is provided by a rail carrier. Nor do we agree with Central States that subsections (a) and (f), taken together, unambiguously support its position. We have already recognized that subsection (a) bestows broad exemption powers upon the ICC in matters "related to a rail carrier providing transportation," and that the scope of subsection (a) includes independently arranged TOFC motor traffic. See supra pp. 1102-1103. While subsection (f)'s specification of intermodal transportation provided by a rail carrier might, as Central States argues, be interpreted to limit this otherwise broad authority by implication, the permissive wording of subsection (f) bears an alternative interpretation: Congress might have intended simply to identify continuous intermodal movement provided by a rail carrier as a particularly appropriate candidate for exemption under section 10505(a). Indeed, the Fifth Circuit has interpreted the relation of subsections (a) and (f) in just this way. See American Trucking Ass'ns, 656 F.2d at 1120-21 ("[T]he source of the Commission's authority to grant exemptions is found in section 10505(a) and not in section 10505(f), which simply singles out continuous intermodal movement as an appropriate candidate for the exercise of the Commission's section 10505(a) exemption authority.").
 
 
 28
 This interpretation is supported by a comparison between the form of subsection (f) and that of subsections (e) and (g). Subsections (e) and (g)--unlike subsection (f)--explicitly limit the Commission's subsection (a) exemption authority by expressly prohibiting certain kinds of exemption orders. Subsection (e) provides:
 
 
 29
 No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11707 of this title. Nothing in this subsection or section 11707 of this title shall prevent rail carriers from offering alternative terms nor give the Commission the authority to require any specific level of rates or services based upon the provisions of section 11707 of this title.
 
 
 30
 49 U.S.C. Sec. 10505(e) (emphasis added). Subsection (g) is structurally parallel:
 
 
 31
 The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle.
 
 
 32
 49 U.S.C. Sec. 10505(g) (emphasis added). Congress could similarly have expressed subsection (f) as an unambiguous limitation on the Commission's subsection (a) authority, by providing, for example, that "The Commission may not exempt intermodal transportation except when provided by a rail carrier," or that "The Commission may not exercise its authority to exempt intermodal transportation other than that provided by a rail carrier." Congress, however, did not do so. Instead, it chose a grammatical form compatible with the interpretation that the Commission defends--the interpretation that subsection (f) is entirely permissive, i.e., that it simply invites the Commission to exempt TOFC transportation provided by a rail carrier without preventing it from exempting other kinds of TOFC traffic that satisfy the criteria of subsection (a). Thus, as a matter of textual exegesis, the Commission's interpretation is not implausible. The text of section 10505(f), in sum, does not unambiguously support Central States' contrary position.
 
 
 33
 Furthermore, this court has made clear that "[t]he 'traditional tools of statutory construction' include not only the words of the statute, but also its relevant legislative history." Local Union 1261 v. Federal Mine Safety Comm'n, 917 F.2d 42, 46 (D.C.Cir.1990) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). Far from establishing that Central States' position is unambiguously correct, we think that the legislative history of section 10505 strongly supports the Commission's view that Congress did not intend to bar the Commission from exempting TOFC transportation not provided by a rail carrier. See infra Part V.
 
 
 34
 Accordingly, we review the Commission's decision under the second step of Chevron analysis. "The question for the court," then, "is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. For the reasons set out below, we conclude that the ICC's decision meets this standard.
 
 V.
 
 35
 The bill that became the Staggers Act passed the Senate on April 1, 1980. While section 10505(a) was virtually identical to the version that became law,[8] the Senate bill contained no provision equivalent to present subsection (f). See 126 CONG.REC. 7301 (1980). Nor did the bill that emerged from the House committee in mid-May contain such a provision. See H.R.REP. NO. 1035, 96th Cong., 2d Sess. 8-9 (1980). The House committee report explained that the bill as it then stood "clarifies and broadens the Commission's existing exemption authority under Section 20 (49 U.S.C. [Sec.] 10505) of the 4R Act." Id. at 60.[9] Noting that the committee had "followed the Commission's exemptions closely," the report complained of the ICC's "considerable initial delay" in exercising its exemption authority under the 4-R Act, but expressed approval of the exemptions the Commission had thus far issued. The report referred in this connection to the ICC's advance notice of proposed rulemaking ("ANPR") in Sub-No. 5, the first TOFC/COFC exemption proceeding. The ANPR stated that the purpose of the proposed rulemaking was "to determine whether some form of exemption for the rail portion of TOFC service is a feasible method of accomplishing our purpose of encouraging this intermodal service." 44 Fed.Reg. 49279, 49280 (proposed Aug. 22, 1979). The ANPR's summary of the five issues on which the Commission proposed to promulgate rules placed this issue first on the list. See id. at 49279.[10]
 
 
 36
 The legislative history of subsection (f) strongly suggests that it was intended to affirm the Commission's 10505(a) authority to issue the proposed rule mentioned in the ANPR for Sub-No. 5, not to bar the Commission from further deregulating TOFC traffic. The provision now codified as section 10505(f) was introduced as a floor amendment, sponsored by Representative Ertel of Pennsylvania. The only substantial discussion of the amendment was Ertel's short speech on its behalf. That speech is instructive. Ertel began by extolling the virtues of intermodal freight transportation: greater use of TOFC/COFC service, he said, would conserve fuel, reduce highway maintenance and railway operating costs, increase productivity, and help maintain American competitiveness in the world economy. See 126 CONG.REC. 19397 (1981). TOFC/COFC service, however, was in his view "woefully underutilized." Id. One important reason that it was underutilized, Ertel argued, was that "the regulatory structure has inhibited intermodal growth by isolating modes from one another." Id. at 19397-98. Each mode was walled off from the others within its own peculiar regulatory structure; "in many cases," Ertel contended, "the cost of compliance" with these various regulatory regimes "is simply too high." Id. at 19398.
 
 
 37
 Consistent with these prefatory remarks, Ertel described his amendment as a call for the ICC to begin breaking down the regulatory barriers he had identified: "By explicitly giving the ICC the authority to eliminate some of this redtape," Ertel said, "my amendment is a first step toward a coherent nat[ion]al transportation system." Id. (emphasis added). Nothing in his advocacy for the amendment suggested that it was intended to limit the ICC's section 10505(a) authority in any way. The floor manager and minority spokesperson endorsed the amendment as "helpful," and the House adopted it by voice vote.
 
 
 38
 The conference committee adopted the Ertel amendment as section 10505(f). The conference report contained a section-by-section analysis of each difference between the House, Senate, and conference versions of the bill, "except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes." H.REP. NO. 1430, 96th Cong., 2d Sess. 79 (1980). In its analysis of the House version of section 10505, however, the conference report said not a word about the Ertel amendment, not even in the paragraph discussing "certain limits" that the House had put "on the Commission's authority to grant exemptions." By contrast, the report did enumerate and discuss the three limitations adopted in subsections (e) and (g). Id. at 104-105. As noted in Part IV above, each of these limitations on the Commission's section 10505(a) exemption authority was, in marked contrast to subsection (f), explicitly worded as a restriction on, not an illustration of, the Commission's authority.[11]
 
 
 39
 Nor did the discussion of the conference substitute mention subsection (f). Rather, the conferees explained:
 
 
 40
 The bill permits exemptions wherever regulation is not needed to prevent abuses of market power, regardless of the presence of effective competition. The policy underlying this provision is that while Congress has been able to identify broad areas of Commerce where reduced regulation is clearly warranted, the Commission is more capable through the administrative process of examining specific regulatory provisions and practices not yet addressed by Congress to determine where they can be deregulated consistent with the policies of Congress. The conferees expect that, consistent with the policies of this Act, the Commission will pursue partial and complete exemptions from remaining regulation. The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose.
 
 
 41
 Id. at 105 (emphasis added). The report continued to note that the conferees "particularly" expected that the Commission would reduce economic regulation of services provided by rail carriers. Id.
 
 
 42
 In light of this legislative history, we think that the ICC could reasonably interpret subsection (f) not to limit the Commission's general section 10505(a) exemption authority, but instead, simply to identify TOFC/COFC service provided by rail carriers as a service meet for Commission exemption. See American Trucking Ass'ns, 656 F.2d at 1120-21. This interpretation is consistent with the House committee's favorable reference to the Sub-No. 5 proceedings, and with the conferees' position that Congress could identify only "broad areas of [c]ommerce where reduced regulation is clearly warranted." The ICC, according to the conferees, would necessarily enjoy large discretion in carrying out the deregulatory program that Congress envisioned.
 
 
 43
 Nor, we reiterate, did the sponsor of section 10505(f), Representative Ertel, see it as limiting the Commission's exemption powers. Indeed, he complained that existing regulation had unjustifiably burdened intermodal transportation, particularly by imposing uncoordinated regulatory regimes upon its rail, motor, and water legs. Section 10505(f) was to be a "first step" forwarding TOFC deregulation, not its final resting place. It would be ironic, then, if we were to construe this same section to bar the ICC from taking further steps consonant with the Commission's general powers under section 10505(a), and to prevent the Commission from coordinating its regulatory approach to the various segments of TOFC/COFC service.
 
 VI.
 
 44
 We hold, in sum, that the ICC's construction of section 10505 is a permissible reading of the statute, not that the Commission has advanced the only permissible reading. Indeed, we note--although neither side to this appeal has made the point--that from late 1980 to early 1981, the Commission itself read the statute in the very way that Central States still espouses.
 
 
 45
 The August 1979 ANPR for Sub-No. 5, issued before passage of either the Staggers Act or the MCA, did not propose any exemptions for TOFC/COFC motor carrier operations. See 44 Fed.Reg. at 49279 (summary of topics for proposed rulemaking); see also id. at 49280. The ANPR did, however, mention in its "general proposals" section[12] the "possibility ... that the motor carrier portion of TOFC/COFC service might be exempted from regulation as a service in '... a matter related to a rail carrier' under section 10505( [a] (the rail exemption)." The Commission sought public comment on this approach, but remarked that "it is by no means clear that the exemption can be construed to apply to 'rail-related' motor services."
 
 
 46
 Accordingly, the Commission did not propose deregulation of any motor carrier TOFC/COFC service in its November 1980 Notice of Proposed Rule ("NPR"). The Commission began the NPR by observing that the Staggers Act and the MCA, both enacted between the ANPR and the NPR, had
 
 
 47
 profoundly affected the content, direction, and procedure of this proceeding. Our exemption authority related to transportation provided by railroads has been strengthened and clarified. Nonrail regulatory barriers have been essentially eliminated.
 
 
 48
 364 I.C.C. at 392.[13] Just as Central States now does, the Commission initially read the MCA amendments, together with subsection (f)'s specific reference to the Commission's exemption authority over "transportation that is provided by a rail carrier," to mean that it had no authority to deregulate motor carrier TOFC/COFC service not provided by a railroad. The Commission concluded:The advance notice raised the possibility of exempting the motor portion of TOFC service. Under the new law exemption is limited to "transportation that is provided by a rail carrier." Although exemption of the motor portion not provided by a rail carrier is no longer possible, we are satisfied that many of the regulatory barriers to intermodal service which we identified in the advance notice have been removed by the Motor Carrier Act of 1980.
 
 
 49
 NPR at 396. Three months later, the Commission adopted the proposed rules in Sub-No. 5 with only technical changes, and without a word as to its exemption authority over motor TOFC service not provided by a railroad. 364 I.C.C. 731, 739-40 (1981).
 
 
 50
 On the same day that it adopted final rules in Sub-No. 5--and just ninety days after professing its lack of authority to exempt motor TOFC transportation not provided by a railroad--the ICC proposed to "round out the approved exemption" in a new proceeding, Sub-No. 6, that would exempt motor TOFC transportation "performed by the railroad or any motor carrier regardless of its ownership or affiliation." 46 Fed.Reg. at 14365 (proposed Feb. 27, 1981). The Commission particularly emphasized its authority under sections 10505(a) and (f) to exempt railroad-affiliated trucking service, but it also cited comments from the Sub-No. 5 proceeding that supported ICC authority to deregulate all TOFC truck service. Commissioner Clapp, concurring separately, noted that the proposed rule "would exempt all motor carrier TOFC/COFC transportation. This may go beyond the bounds contemplated by 49 U.S.C. Sec. 10505," Clapp said, and he encouraged participants in the rulemaking to address this issue. Id.
 
 
 51
 More than six years later, the Commission issued final rules in Sub-No. 6. The rules deregulated TOFC trucking service when performed by motor carriers operating as agents of railroads or as their joint-rate partners. While the Commission did not deregulate independently arranged pickup and delivery service, it did offer a reasoned analysis justifying its authority to do so.
 
 
 52
 The Commission observed, first, that "[i]t has long been recognized that the rail and highway ... portions of TOFC/COFC service are integrally related, because no single mode of transportation standing alone normally satisfies the needs of a TOFC/COFC shipper." Sub-No. 6, 3 I.C.C.2d 869, 872 (citing American Trucking Ass'ns, 387 U.S. at 420). Relying on the Fifth Circuit's 1981 affirmance of the Sub-No. 5 decision, the Commission now argued that the source of its exemption authority is section 10505(a), while section 10505(f) merely "illustrates a type of service as to which Congress suggested the exemption authority be exercised." 3 I.C.C.2d at 872 (citing American Trucking Ass'ns, 656 F.2d at 1120-21). The ICC rejected the argument, based on the MCA amendments, that it once found persuasive:
 
 
 53
 The motor carrier legislation was debated and enacted before Congress completed the 1980 rail legislation, and Congress at that time had not yet decided whether or to what extent rail piggyback service should be exempted. Thus, although Congress itself did not create an exemption for joint motor/rail TOFC/COFC services at the time that it passed the MCA, later in the Staggers Act it delegated to us the discretion to grant such an exemption by relaxing the requirements for an exemption "in a matter related to a rail carrier" and simultaneously singling out TOFC/COFC as a likely candidate for exemption.
 
 
 54
 Id. at 876.
 
 
 55
 The relaxed licensing provisions, the Commission said, were to apply to TOFC/COFC service until and unless the Commission granted a further exemption. See id. Finally, the Commission noted the Fifth Circuit's remark that Congress probably had no particular view about exemption of TOFC truck service and had instead delegated that authority to the ICC. See id. at 877 (citing the Staggers Act conference report). Under Chevron, the Commission concluded, it was free to decide the issue "in any manner that is consistent with the overall statutory scheme." Id. With a few refinements,[14] the Commission adhered to this position in Sub-No. 7. See 6 I.C.C.2d 208 (1989); Improvement of TOFC/COFC Regulations (Pickup and Delivery), Ex Parte No. 230 (Sub-No. 7) (slip op. denying stay, Jan. 12, 1990).
 
 
 56
 Thus beginning with the Sub-No. 6 proceedings, the ICC reversed its position of late 1980 that it lacked authority to exempt independently arranged motor TOFC/COFC operations. An agency, of course, may change its interpretation of a governing statute, but only if it provides cogent reasons for doing so. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); Advanced Micro Devices v. CAB, 742 F.2d 1520, 1542 (D.C.Cir.1984) ("[A]n agency changing its course must supply a reasoned analysis that prior policies and standards are being deliberately changed, not casually ignored.") (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)). The Commission, we hold, offered an adequately reasoned analysis in its 1987 decision adopting final rules in Sub-No. 6, and it has reaffirmed that analysis in the Sub-No. 7 proceeding that we now review. Because we are satisfied that the Commission's current interpretation is a permissible reading of section 10505, and that the ICC has adequately justified that interpretation, we affirm the Commission's decision. Accordingly, Central States' petition for review is
 
 
 57
 Denied.
 
 SILBERMAN, Circuit Judge, dissenting:
 
 58
 I wish I could join the majority opinion. This third tranche of deregulation of shipping of trailers and containers on sequential rail and truck movements (TOFC/COFC) seems eminently sensible as a policy matter, and there is much with which I heartily agree in the majority opinion concerning the dangers of applying step one of the Chevron analysis too broadly so as to avoid deferring to an agency's interpretation of an ambiguous statute. Nevertheless, I find the plain language of that portion of the statute, Sec. 10505(f), which "directly addresses" the Commission's relevant authority to be a bar to the Commission's rule. Therefore, I respectfully dissent.
 
 I.
 
 59
 In 1981 the Commission exempted from regulation all intermodal operations performed by railroad-owned trucks. See Improvement of TOFC/COFC Regulation, 364 I.C.C. 731 (1981). The Fifth Circuit denied a petition for review of the ICC's order in American Trucking Ass'ns v. ICC, 656 F.2d 1115 (5th Cir.1981), holding that the truck portion of an intermodal movement was "related to a rail carrier providing transportation" within the meaning of 10505(a). It also suggested in addition that the truck portion was in fact "provided by a rail carrier" within the meaning of 10505(f), see id. at 1120.
 
 
 60
 The Commission then took a second deregulatory step and exempted from regulation independent motor carriers engaged in intermodal traffic where a motor carrier was affiliated with a railroad by acting as an agent of a railroad or pursuant to a joint rate with a railroad.[1] See Improvement of TOFC/COFC Regulations, 3 I.C.C.2d 869 (1987). This exemption covered those instances where a shipper dealt with a motor carrier and a railroad which were holding out their joint service to the customer as a single operation.
 
 
 61
 The next step was the order challenged by this petition. It deregulates independent motor carrier services which are a part of the intermodal movement even when there is no affiliation between the motor carrier and the railroad. Improvement of TOFC/COFC Regulation, 6 I.C.C.2d 208 (1989). The exemption applies when the railroad picks up a trailer/container from a motor carrier or vice versa. The shipper, however, may enter into two unrelated contracts with a railroad and a motor carrier and arrange the timing of the intermodal transfer while dealing with both the motor carrier and the railroad as two separate entities.
 
 II.
 
 62
 I agree with my colleagues that subsection 10505(a) if read by itself can be said to be ambiguous on the issue before us.[2] The phrase "in a matter related to a rail carrier providing transportation ...," is unclear in its reach because the term "related" is imprecise. It could be construed--perhaps, it is more obviously construed--as did dissenting Commissioner Lamboley--to concern only such matters as "tariff filing, rates and charges, abandonments, acquisitions and securities issuances" involving railroads. Improvement of TOFC/COFC Regulation, 6 I.C.C.2d at 224. On the other hand, if section (a) stood alone it might be thought to give the Commission authority to exempt motor carriage as part of through movements when a railroad owns the trucking facilities or when the railroad is affiliated through a joint bill with a trucking company; or it perhaps could even be stretched to extend ICC authority to the "matters" in this case, where the only connection between the railroad and the trucking company is the continuous movement of the container. In other words, were this the only portion of section 10505 that came into play, I would agree that this case should be analyzed under Chevron "Step II."
 
 
 63
 Inconvenient though it may be, the very same section of the Act includes another subsection which squarely deals with the subject of intermodal transportation deregulation:
 
 
 64
 (f) The Commission may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.
 
 
 65
 That subsection quite specifically authorizes the Commission to exempt trucking and water carriage from its regulation under two conditions: when it is "provided" by a rail carrier and when it is part of a continuous movement.[3] As petitioners point out, both subsections must be examined at which point two propositions are apparent: (1) that Congress "directly addressed" the issue presented to us in subsection (f), and (2) therefore, the interpretation the Commission places on subsection (a) is simply implausible.
 
 
 66
 The ICC does not claim that railroads are "providing" the intermodal carriage at issue here. Instead, the Commission claims, and the majority accepts the notion, that subsection (f) does not mean what it says; that it does not "limit" the Commission's power to deregulate trucking rates to those circumstances where the railroads are providing the motor carriage as part of a continuous movement. The Commission reaches its rather farfetched interpretation of the language of the statute by first analyzing subsection (a) as if it were passed years previously and after arriving at a broad meaning for subsection (a)--a meaning which authorizes the Commission's rule--only then questioning whether Congress really intended to cut back on that broad grant by subsequently passing subsection (f). I think that approach is quite artificial. After all, we are examining two subsections passed in the very same statute and we have said repeatedly that "statutes should be construed 'to give effect, if possible, to every word Congress used.' " American Fed'n of Gov't Employees v. FLRA, 798 F.2d 1525, 1528 (D.C.Cir.1986) (citations omitted). To be sure, as the majority emphasizes, Maj. Op. at 1106-1107, subsection (f) was a floor amendment, but I do not think it can be read out of the statute because a Congressman offered his amendment in that fashion. Although the conference report does not specifically mention subsection (f)--indeed, the report was apparently written before the amendment because it refers to a subsection (g) that (f) replaced--we know that the amendment was offered by a real live Congressman, Ertel,[4] and voted upon by a real live Congress.
 
 
 67
 The majority seems to follow the same reasoning process as the Commission. By the time my colleagues get around to discussing what they agree is the main issue of the case--the interpretation of section (f)--it would appear that they are already convinced that subsection (a) is a positive grant of authority to do all that the Commission would like to do regarding intermodal transportation. Accordingly, subsection (f) is read with what seems to be a jaundiced eye that finds linguistic imprecision and ambiguity where it does not exist. Indeed, the majority suggests (albeit only suggests) a notion that not even the Commission advanced, that subsection (f) can be thought to be ambiguous because it is in tension with subsection (a). Maj. Op. at 1105. That is naked analytical bootstrapping since the tension is only created after the court gives subsection (a) a sweeping meaning in conflict with subsection (f).
 
 
 68
 The crucial issue, of course, is whether subsection (f) can be thought to be ambiguous. Only by so holding, and thereby passing this first step of Chevron, can the majority go on to consider whether the Commission's interpretation is reasonable. The majority concludes that it is ambiguous and therefore it can proceed because subsection (f) does not address "the precise question at issue," which must be: was the Commission authorized to deregulate the rates on the trucking portion of intermodal service when railroads cannot be thought to "provide" that trucking service? I quite agree with my colleagues, indeed, I think it very important to be said, that if the Courts of Appeals read the "precise question at issue" too broadly the Supreme Court's decision in Chevron can be undermined and appropriate deference to an agency interpretation would thereby be avoided. I understand us to be in disagreement, however, not as to the precise question before us but rather as to how to interpret Congress' answer.
 
 
 69
 The majority would have it that Congress was silent as to trucking that is part of intermodal transportation and is not provided by a railroad. I do not think that is a fair reading of the text any more than if Congress banned the importation of apples, oranges, and bananas from a particular country and it were then argued that the ban included grapefruits as well. In both cases what is perhaps the most reliable maxim of statutory construction, expressio unius est exclusio alterius, tells us that Congress does have a specific intent to authorize certain actions but not other actions not specified, see Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, 1293 (D.C.Cir.), aff'd by an equally divided Court, 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989). Subsection (f) did not say to the ICC "go and deregulate to your heart's content," it did not say "deregulate any and all motor carriage," and it did not say "deregulate motor carriage used to transport containers travelling intermodal whether or not such motor carriage is provided by railroads and whether or not the intermodal movements are continuous."[5]
 
 
 70
 Surely if subsection (f) is thought to be a positive law authorizing agency action that would not otherwise be permitted, then my reading is compelling. The majority, it seems to me, tacitly concedes the point by claiming that subsection (f) can be read as "permissive," Maj. Op. at 1105 which I take to mean it can be interpreted as words Congress adopted while intending them to have no legal effect whatsoever. It is suggested that subsection (f) might have been designed to "encourage" (not to authorize) the Commission in proceeding with a then-pending rulemaking "to determine whether some form of exemption for the rail portion of TOFC service is a feasible method of accomplishing our purpose of encouraging this intermodal service." Maj. Op. at 1106 (quoting Notice of Rulemaking, 44 Fed.Reg. 49,279, 49,280 (Aug. 22, 1979)) (emphasis added). But Congressman Ertel when introducing his amendment did not mention the proposed rulemaking which in any case was not directed at deregulating the motor carriage segment of intermodal transportation. It was only after passage of the statute, including the Ertel amendment, that the Commission broadened the rulemaking's focus. Nor did Congressman Ertel suggest (not surprisingly) that his amendment was not necessary because it merely duplicated the authority bestowed in subsection (a). Yet as I understand the majority opinion, Congressman Ertel might as well have stayed home--his amendment has no legal significance. Subsection (f), we are to believe, was passed as an amendment only to suggest to the Commission a good example--"a particularly appropriate candidate" for the exercise of its subsection (a) broad exemption authority. Maj. Op. at 1105. Congressman Ertel might well respond with the old line, "If I wanted to send a message I would use Western Union."[6]
 
 
 71
 To be sure, as the majority notes at 1105, Congressman Ertel could have phrased his amendment, the grant of authority in subsection (f), to include a reciprocal prohibition against the ICC deregulating truck carriage rates when the intermodal service is not provided by a railroad. In other words, he could have made the implicit "not" explicit--but he had no reason to do so. Congressman Ertel could not have known that the ICC would subsequently in three steps construe subsection (a) as granting the Commission such broad authority as to, at this point, render subsection (f) meaningless.
 
 
 72
 Finally, the majority relies upon legislative history, the discussion of which it incorporates by reference into its Chevron step one analysis, as inadequate to establish that petitioner's reading of the statute is "unambiguously correct," Maj. Op. at 1105. That sounds very much as if the majority is adopting a rather unorthodox approach to statutory interpretation--indeed one that turns tradition on its head--by insisting that Congress confirm the plain meaning of statutory language with legislative history. In any event, there is nothing in the legislative history--absolutely nothing--that contradicts the plain meaning of subsection (f). Indeed, as Commissioner Lamboley forcefully pointed out in his dissent, "the most salient aspect of that history was the full Senate's rejection of a Commerce Committee amendment to the [Motor Carrier Act] which would have exempted independently provided truck service incidental to rail TOFC transport." 6 I.C.C.2d at 224-25 (emphasis added).[7]
 
 
 73
 * * * * * *
 
 
 74
 This is a case of the self-confirming hypothesis. It is possible to arrive at the majority's position only if one is led first to pour specific content into subsection (a)--to make it say directly what it does not say but might be read to say in the absence of subsection (f). Then, after constructing this analytical castle, one may ask skeptically, as does the majority, did Congress really intend to cut down the castle's ramparts. The answer at that point is, I submit, all too compelling.
 
 
 
 [1]
 The exception is so-called "Plan I" service, which the ICC has characterized as
 [r]ailroad movement of trailers or containers of motor common carriers, with the shipment moving on one bill of lading and billing being done by the motor carrier. Traffic moves under rates in regular motor carrier tariffs, and the railroad's compensation is arrived at by negotiation between the two carriers.
 American Trucking Ass'ns v. Atchison, T. & S.F. Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967) (quoting Substituted Service--Charges and Practices of For-Hire Carriers and Freight Forwarders (Piggyback), 322 I.C.C. 301, 304 (1964)).
 
 
 [2]
 As provided in the Revised Interstate Commerce Act, Pub.L. No. 95-473, 92 Stat. 1337 (1978) (codified at 49 U.S.C. Sec. 10505 (Supp. III 1979)):
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service because of the limited scope of the transaction or service, when the Commission finds that the application of a provision of this subtitle--
 (1) is not necessary to carry out the [national] transportation policy ...;
 (2) would be an unreasonable burden on a person, class of persons, or interstate and foreign commerce; and
 (3) would serve little or no useful public purpose.
 The effect of the Revised Interstate Commerce Act on the 4-R Act was simply to renumber the sections of the 4-R Act and to make technical changes in its wording.
 
 
 [3]
 The Commission did exempt railroad shipment of fresh produce from rate regulation. See Rail General Authority--Fresh Fruits and Vegetables, 361 I.C.C. 374 (1979)
 
 
 [4]
 Central States does not dispute the Commission's findings, pursuant to Sec. 10505(a), that economic regulation is not necessary to carry out the rail transportation policy of Sec. 10101(a) or to protect shippers from the abuse of market power
 
 
 [5]
 We also reject Central States' more particular argument against Chevron deference to the Commission's interpretation of the relation between sections 10505(a) and (f). See infra Part IV
 
 
 [6]
 The Commission describes an equipment interchange agreement as "a contract authorizing the transfer of equipment between two carriers. It is used to protect the owner's interest in the equipment.... The existence of such an agreement ... ensures continuity of service between the modes." Joint Brief of Respondents at 9 n. 17
 
 
 [7]
 At this point, the Staggers Act had not been passed, and the Commission had not exercised its narrow exemption authority under the 4-R Act. See supra pp. 1100-1101 & note 2
 
 
 [8]
 The only substantive difference was a proviso appended to the subsection, to the effect that "the Commission may not issue any exemption which will substantially lessen competition and coordination between water and rail carriers." 126 CONG.REC. 7301 (1980)
 
 
 [9]
 Central States argues in its opening brief that subsection (f) broadened the ICC exemption authority, citing the language quoted in the text. It similarly claims in its reply brief that subsection (f), not subsection (a), broadened the relevant exemption authority. Central States implies that section 10505(a) therefore would not by itself permit the Commission to issue any exemptions concerning intermodal service; the permissible scope of such exemptions, according to Central States, is determined by subsection (f) alone
 The only support Central States invokes for its claim that the ICC's exemption authority was broadened by subsection (f), not subsection (a), is the language of the House report just quoted. We have just seen, however, that when this report was written, subsection (f) had not yet been added to the bill. The language in this report therefore offers no support for Central States' position.
 
 
 [10]
 Two of the other four proposals concerned relaxation of licensing requirements for TOFC motor service. These proposals were incorporated in the MCA, see supra pp. 1103-1104. Another proposal was to establish a "zone of reasonableness" for motor TOFC/COFC rates. The MCA included such a provision at 49 U.S.C. Sec. 10708(d). The final proposal concerned "Plan I" TOFC service, see supra note 1. The Commission has not yet deregulated this service
 Although the "general proposals" section requested public comment on the possibility of exempting the motor carrier portion of TOFC/COFC, and expressed doubt as to whether the Commission had authority to do so, the ANPR did not identify motor carrier exemption as a subject of the proposed rulemaking. See infra p. 1108.
 
 
 [11]
 The report mistakenly referred to subsection (g) as subsection (f), which it had been before the Ertel amendment. No other amendment to Sec. 10505 could plausibly be called a "limit" on ICC exemption authority
 
 
 [12]
 The Commission described these proposals as "intended to stimulate thought and comment." Id. at 49280
 
 
 [13]
 As we have seen, the Commission's exemption authority over rail-related transportation was "strengthened" by the revised 10505(a), and its authority to deregulate transportation provided by a rail carrier was "clarified" by the new section 10505(f). The "nonrail regulatory barriers" were "essentially eliminated" by the MCA, which accomplished three of the five reforms that the rule-making was intended to pursue. See supra p. 1106 & note 10
 
 
 [14]
 The Commission now cites the colloquy among Cannon, Stevenson and Hollings in the debates over the MCA amendments. See 6 I.C.C.2d at 213-14 & n. 10
 
 
 [1]
 In a joint rate arrangement, the shipper is faced with one bill for the entire voyage and the apportionment of the charged sum as well as the liability for any damage is contractually established between the motor carrier and the railroad
 
 
 [2]
 (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle--
 (1) is not necessary to carry out the transportation policy of Sec. 10101a of this title; and
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 
 
 [3]
 It is undisputed that in this case the movements are "continuous."
 
 
 [4]
 Conference Reports, as we know, do not always share that characteristic. See Blanchard v. Bergeron, 489 U.S. 87, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring)
 
 
 [5]
 I assume the majority would similarly disregard the continuity limitation if the Commission wished to take the "next step."
 
 
 [6]
 He did say, as the majority quotes, that "my amendment is a first step toward a coherent nat[ion]al transportation system," Maj. Op. at 1107, but I find it impossible to glean from that statement even the suggestion that the Commission was authorized to take any number of future steps on its own
 
 
 [7]
 The Motor Carrier Act is a different, although complementary, statute, but it was enacted the same year and the incident to which Commissioner Lamboley refers is the only time that Congress directly addressed the intermodal transportation issue (other than in the language of Sec. 10505(f))